# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1316

_____

United States of America,　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Plaintiff-Appellee,　　　　*
　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　　v.　　　　　　　　　　　　　*　District Court for the District
　　　　　　　　　　　　　　　　　*　of North Dakota.
Alfonso Rodriguez, Jr.,　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Defendant-Appellant.　　　*

_____

Submitted: February 12, 2009
Filed: September 22, 2009

_____

Before LOKEN, Chief Judge, MELLOY and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted Alfonso Rodriguez, Jr., of kidnapping Dru Kathrina Sjodin and transporting her across state lines, resulting in death. **18 U.S.C. § 1201(a)(1)**. The jury imposed a sentence of death. *See* **18 U.S.C. §§ 3591, 3593**. Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3595(a), this court affirms.

I.

Dru Sjodin left a mall in Grand Forks, North Dakota, on the afternoon of November 22, 2003. After she missed work that evening, a friend reported her absence to the police, who discovered her car in the mall's parking lot with a knife

sheath beside it. Sjodin's phone-service provider, when contacted, told police her phone was "bouncing" off a cell tower near Crookston, Minnesota. Three days later, investigators found one of Sjodin's shoes under a bypass near Crookston.

Investigators interviewed persons in the surrounding area with convictions for kidnapping or sex offenses. Alfonso Rodriguez, Jr. — a Crookston resident and a Level III sex offender released from prison six months earlier — told police he traveled to Grand Forks on November 22 to visit the mall and see a movie. Police examined his car, which had small blood splatters in the back seat and a knife in the trunk matching the sheath found near Sjodin's car. The movie Rodriguez claimed to have watched on November 22 was not playing at the mall's movie theater that day.

Sjodin's body was found on April 17, 2004, in a drainage ditch outside of Crookston; her phone was nearby. Her body was naked below the waist, hands tied behind her back. Rope and remnants of a plastic bag encircled her neck. Her upper-body garments were pulled down off her shoulders. Police recovered hair and fiber samples from the body, which matched Rodriguez and his possessions. According to the autopsy, the most likely cause of death was asphyxiation or suffocation, a slash wound to the neck, or exposure to the elements.

The government charged Rodriguez with kidnapping Sjodin and transporting her across state lines, resulting in death. **18 U.S.C. § 1201(a)(1)**. Seeking the death penalty, the government charged four statutory aggravating factors, 18 U.S.C. § 3592(c)(1), (4), (6), and (9).

The jury convicted Rodriguez of the single count. The district court[1] bifurcated penalty proceedings into an eligibility phase and a selection phase.

---

[1]The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota.

During the eligibility phase, the jury found the government proved three statutory aggravating factors beyond a reasonable doubt: (1) 18 U.S.C. § 3592(c)(1), causing death during commission of another crime, kidnapping; (2) § 3592(c)(4), at least two prior felony convictions for infliction or attempted infliction of serious bodily injury; and (3) § 3592(c)(6), committing the offense in an especially heinous, cruel, or depraved manner. The jury found the government did not prove: (4) § 3592(c)(9), committing the offense after substantial planning and premeditation.

During the selection phase, Rodriguez called 24 witnesses, the government six. Rodriguez submitted 30 mitigating factors; jurors found 25, including 19 unanimously. The government submitted one non-statutory aggravating factor — loss, injury, and harm to Dru Sjodin and her family, which the jury found unanimously. The jury recommended a sentence of death, which the district court imposed. *See id.* **§ 3594**.

Rodriguez appeals, challenging venue, jury composition and selection, evidentiary rulings, penalty-phase closing arguments, the 18 U.S.C. § 3592(c)(4) aggravating factor, penalty-phase jury instructions, and the constitutionality of the death penalty.

## II. Venue

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." **U.S. Const. amend. VI**. "[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999), *quoting United States v. Lombardo*, 241 U.S. 73, 77 (1916). Here, the crime consisted of distinct parts occurring in North Dakota and Minnesota, and venue would have been proper in either district. **Fed. R. Crim. P. 18**.

A North Dakota grand jury indicted Rodriguez, who moved to change venue to Minnesota, citing pretrial publicity. This court examines denials of change-of-venue motions based on pretrial publicity under a two-tier standard for presumed prejudice and actual prejudice. ***United States v. Blom***, 242 F.3d 799, 803 (8th Cir. 2001). Rodriguez argues: (a) the district court erred by not finding a presumption of prejudice in North Dakota, (b) jurors' voir dire statements demonstrated actual prejudice, (c) Criminal Rule 21 required transfer of venue, and (d) by denying additional funds for a venue study, the district court violated *Ake v. Oklahoma*, 470 U.S. 68 (1985). This court reviews denials of venue and *Ake* motions for abuse of discretion. ***United States v. Stanko***, 528 F.3d 581, 584 (8th Cir. 2008) (venue); ***United States v. Ross***, 210 F.3d 916, 921 (8th Cir. 2000) (*Ake*).

A. Presumption of prejudice analysis

A motion to change venue must be granted if "pretrial publicity was so extensive that a reviewing court is required to presume unfairness of constitutional magnitude." ***Blom***, 242 F.3d at 803 (quotations and citations omitted). In *Irvin v. Dowd*, the Supreme Court presumed prejudice when a newspaper received by 95 percent of local residents commented on the accused serial killer's presumed guilt, prior crimes, lie-detector test failure, confession, and anticipated punishment. ***Irvin v. Dowd***, 366 U.S. 717, 725-26 (1961).

To show a presumption of prejudice, Rodriguez cites extensive North Dakota media coverage, including 241 articles about the case in the *Fargo Forum* (some allegedly inflammatory); statements by public officials about the case; two public opinion polls, from September 2004 and February 2006; statements by 98 of 214 examined venirepersons indicating a belief in Rodriguez's guilt; and, statements by serving jurors about public animosity toward Rodriguez.

Denying the motion to change venue, the district court took several measures to reduce the risk of prejudice. The court moved the trial from Grand Forks to Fargo, 80 miles away, and excluded Grand Forks-area residents from the venire. The court assembled a 590-person jury pool, twelve times the normal size, and required jurors to answer a 121-question form, including detailed questions on their knowledge and beliefs about the case. Rodriguez received ten additional peremptory strikes, for 30 total. The court spent 21 days conducting voir dire. Reviewing the cited newspaper stories, the court concluded they were unlikely to unfairly prejudice the public against Rodriguez.

This court's decision in *United States v. Blom*, 242 F.3d 799 (8th Cir. 2001), answers most of the presumed-prejudice arguments in this case. There, local media extensively reported prosecutors' allegations that Blom kidnapped and murdered a female teenager. Tried on a federal weapons charge, Blom moved for change of venue, citing local media coverage. This court affirmed the denial of the motion, noting the district court moved the trial to a city within the state away from the crime site, excluded crime-area residents from the venire but expanded the venire to the whole state, assembled a jury pool three times the normal size, sent questionnaires to all prospective jurors, and increased the number of peremptory strikes for each side. *Id.* at 803-04. *See also **United States v. Allee***, 299 F.3d 996, 1000 (8th Cir. 2002) (finding no presumption of prejudice, despite 200 articles about the crime, when most news coverage was non-inflammatory and appeared two months-to-one year before trial).

Rodriguez also cites statements by public officials. A U.S. Senator who sponsored "Dru's Law" stated his hope that "justice will be done."[2] The Governor of

---

[2]The proposed "Dru's Law" establishing a national sex offender database was later incorporated in the Adam Walsh Child Protection and Safety Act, Pub. L. No. 109-248, 120 Stat. 587, § 120 (2006).

Minnesota expressed his opinion, after the guilty verdict, that if the death penalty was ever appropriate, it was appropriate in this case. On this record, neither statement unfairly prejudiced Rodriguez.

The only significant distinction between this case and *Blom* or *Allee* is the public opinion data. This court has expressed doubts about the relevance of such polls when reviewing rejected change-of-venue motions. *See* **Shapiro v. Kaufman**, 855 F.2d 620, 621 (8th Cir. 1988) (declining, in a civil case, to attach significance to poll indicating defendant's local popularity); **United States v. Eagle**, 586 F.2d 1193, 1195 (8th Cir. 1978) (finding public opinion survey about attitudes toward Native Americans charged with high-profile killings irrelevant to unrelated case involving Native American defendants); **United States v. Long Elk**, 565 F.2d 1032, 1041 (8th Cir. 1977) (noting the district court considered but declined to rely on a public opinion poll).

At least three other circuits have declined to rely on public opinion polls when reviewing denials of motions for change of venue in criminal cases. *See* **United States v. Campa**, 459 F.3d 1121, 1145-46 (11th Cir. 2006) (en banc) (district court did not err by refusing to rely on public opinion poll when it had methodological problems); **United States v. Malmay**, 671 F.2d 869, 875-76 (5th Cir. 1982) (district court did not err by denying change-of-venue motion when public opinion poll revealed only general public awareness of the crime rather than widespread belief about defendant's guilt); **United States v. Haldeman**, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (trial judge had discretion to ignore "a poll taken in private by private pollsters and paid for by one side," given adequacy of voir dire procedures).

This court's precedents do not require a district court to consider public opinion polls when ruling on change-of-venue motions. Even if these polls were considered, however, they do not demonstrate widespread community prejudice. The first poll,

-6-

conducted in 2004, offers little insight into community views at the time of the 2006 trial. *See Patton v. Yount*, 467 U.S. 1025, 1032 (1984) (noting the trial occurred four years after the initial media coverage "at a time when prejudicial publicity was greatly diminished and community sentiment had softened").

The second poll was conducted six months before Rodriguez's trial in North Dakota's Southeast Division. This poll showed that about 42 percent of the respondents strongly held an opinion of Rodriguez's guilt, and the district court concluded that special voir dire protocols would screen out prejudiced jurors. The court also observed that media coverage had not been inflammatory, and that two years had passed since Sjodin disappeared. The district court did not abuse its discretion by denying the motion for change of venue based on presumed prejudice.

## B. Actual prejudice analysis

Rodriguez next argues that voir dire revealed actual prejudice by some jurors. This court "independently evaluate[s] the voir dire testimony of the impaneled jury in order to determine whether an impartial jury was selected, thus obviating the necessity for a change of venue." *Blom*, 242 F.3d at 804 (citation omitted).

Rodriguez first asserts that eleven jurors' exposure to pretrial publicity demonstrates actual prejudice. By itself, exposure to pretrial publicity, however, does not establish prejudice. *United States v. Bliss*, 735 F.2d 294, 297-98 (8th Cir. 1984) ("[T]he due process guarantee of trial by a fair and impartial jury can be met even where, as here, virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity.").

Next, Rodriguez cites: (1) three serving jurors' knowledge of his prior convictions, received through the media; (2) three serving jurors' alleged opinions of his guilt, based on media accounts; and (3) five serving jurors' statements that, after being called for jury service, they discussed the case with others and received opinions about Rodriguez's guilt.

### 1. Jurors' knowledge of prior convictions

- Juror 3 testified that she "heard a little" about Rodriguez's prior crimes, but stated that "if that's not what the case is about, then that wouldn't be what I would be considering."

- Juror 14 testified that she had heard Rodriguez previously committed some crimes, following which defense counsel told her the details of those crimes. Juror 14 then stated that she "would need to have all of the facts" before deciding Rodriguez's guilt in this case.

- Juror 15 stated that she did not think she had read about any criminal convictions but that, if informed of prior convictions, she would not automatically vote to convict or impose the death penalty.

### 2. Jurors' pretrial opinions of guilt

- Juror 3 testified that, having read some newspaper stories, "I guess you form somewhat of an opinion but it's not — nothing is ground in my mind one way or the other." When asked if she could put that opinion aside she replied, "I think so, yes."

- When asked by the court whether he had an opinion about Rodriguez's guilt or innocence, Juror 8 stated: "No. I guess in the early stages when everything first happened I guess you assume guilty. But right now I guess you need to look at the evidence and see where it goes."

- Juror 11 indicated that, based on initial media accounts, he did believe that Rodriguez was guilty, but that he could put that opinion aside and require the government to prove its case beyond a reasonable doubt.[3]

### 3. Jurors' discussions with other people

- Juror 2 stated that "probably a dozen" close friends and family had expressed their opinions about Rodriguez's guilt, her two sons opined that Rodriguez

---

[3]

Q. As you're sitting here right now, do you have an opinion on the guilt or innocence?
A. Yeah, I have an opinion.
Q. Could you tell me what that opinion is?
A. Right now my opinion is he's guilty.
Q. And what do you base that on?
A. Just on the news reports and such after -- when the case first broke.
Q. And are those the same opinions that you say you could set aside?
A. Yes.
. . . .
Q. Could you give the defendant the benefit of that presumption of innocence?
A. Yes.
Q. And the burden rests on the United States to prove each of the essential elements of the offense charged with proof beyond a reasonable doubt before the defendant could be convicted. Could you give – or hold the United States to that burden?
A. Yes.

"should be done away with," but she herself did not "really have an opinion. I would like to hear the evidence."

- Juror 3 testified that several family members had expressed opinions about the case, but that "I don't go by other people's opinion."

- Juror 11 indicated that his wife and co-workers had expressed opinions about Rodriguez's guilt and their desire for death to be imposed, but he also stated that he could put those opinions aside when serving on the jury.[4]

- Juror 13 testified that his boss believed Rodriguez was guilty, but that he would not feel any pressure to arrive at a guilty verdict because of his boss's opinion.

- Juror 16 noted that while she had expressed to her family sympathy for the victim's family, such sympathy "absolutely . . . cannot be" the basis of a guilty verdict.

---

[4]

Q. And what did they express generally?
A. Probably generally would be guilty.
Q. That would be your co-workers and your friends and your wife?
A. Yes.
Q. Was there expressions about punishment from those same people?
A. Yes. Most of them feel pretty strongly for the death penalty.
. . . .

Q. So do you feel that that would influence you at all?
A. No. I feel I could make this decision on my own, you know, and not get pulled from outside.

In *Blom*, all jurors "had at least some knowledge that Blom was connected with or accused of" the publicized kidnapping. *Blom*, 242 F.3d at 804. This court found no actual prejudice because "[e]ach declared he or she could put aside all pretrial publicity, recognize the presumption of innocence in Blom's favor, and render an impartial verdict based solely on the evidence presented at trial." *Id.*

As for jurors who expressed an initial impression of guilt, if the district court accepts assurances that they will set aside any preconceived beliefs, the court's ruling is a credibility finding, which this court reviews for clear error. *Id.* at 805, *citing Reynolds v. United States*, 98 U.S. 145, 156-57 (1878). "Mere exposure to publicity or the formation of tentative impressions by some jurors is not enough to require a change of venue." *United States v. Harvey*, 756 F.2d 636, 640 (8th Cir. 1985). "The ultimate test is whether a juror has been exposed to pre-trial publicity and, if so, whether he or she can set aside any impression or opinion resulting from that exposure and render a verdict based solely on the evidence presented at trial." *Id.* The district court was not clearly erroneous in finding that the jurors' statements, in context, do not establish actual prejudice.

C. Criminal Rule 21(a)

Rodriguez asserts that Rule 21(a) "grants a defendant even more protection against prejudicial pretrial publicity and community passion than does the constitutional due process standard." The Rule states: "Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." **Fed. R. Crim. P. 21(a)**.

-11-

Rodriguez bases this argument on *Marshall v. United States*, 360 U.S. 310 (1959) (per curiam). There, the Supreme Court reversed a federal conviction when seven jurors read newspaper stories during trial about the defendant's prior criminal conduct. *Id.* at 1172-73. Rodriguez also cites Chief Justice Burger's concurring opinion in *Murphy v. Florida*, which commented on the Court's supervisory powers in federal cases, and a district court decision granting a change-of-venue motion based on its reading of Rule 21(a). *See* **Murphy v. Florida**, 421 U.S. 794, 804 (1975) (Burger, C.J., concurring); **United States v. Tokars**, 839 F.Supp. 1578, 1582-84 (N.D. Ga. 1993).

Rodriguez's Rule 21(a) argument is unpersuasive. Neither the text of the Rule nor the Advisory Committee Note supports his interpretation. *Marshall* does not cite Rule 21, and that case involved juror exposure to news stories during, not before, trial. Chief Justice Burger's concurrence in *Murphy*, which likewise does not cite Rule 21, offers less guidance than the Supreme Court's more specific venue holdings. This court declines to follow the *Tokars* district court's reading of Rule 21(a).

## D. Alleged violation of *Ake v. Oklahoma*

The district court approved $7,500 for venue studies of North Dakota and Minnesota, but denied Rodriguez's request for additional funding to study Minnesota. Rodriguez asserts that the denial of this request violates *Ake v. Oklahoma*, 470 U.S. 68 (1985). "The decision of whether to fund an expert rests in the sound discretion of the trial court and we will not reverse absent an abuse of discretion." **United States v. Ross**, 210 F.3d 916, 921 (8th Cir. 2000).

"[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." **Ake**, 470 U.S. at 74. *Ake* analogizes psychiatric

-12-

evaluations to other criminal defense rights — such as state-provided appeal transcripts and blood tests in paternity suits — but does not mention venue studies. *Id.* at 76. The opinion does, however, state that "the consistent theme of these cases" is "[m]eaningful access to justice." *Id.* at 77.

To establish an *Ake* violation, "the defendant must show a reasonable probability that an expert would aid his defense, and that denial of expert assistance would result in an unfair trial." **Little v. Armontrout**, 835 F.2d 1240, 1244 (8th Cir. 1987) (en banc). The *Little* court reversed a rape conviction based on the victim's hypnosis-induced identification of the defendant. *Id.* at 1244-45. The state courts denied funding for a defense expert to challenge the hypnosis testimony. Reversing, this court found the expert might have shown the victim's identification was influenced by "improper suggestion." *Id.* at 1245.

Assuming, without deciding, that the denial of funding for a venue study could violate *Ake*, Rodriguez must show by a reasonable probability that the additional venue-study funding would have aided his defense, and that the denial of funds resulted in an unfair trial. Neither of the two completed venue studies revealed prejudice sufficient to render a trial unfair, and the district court's 21-day voir dire process screened out prejudiced jurors, consistent with *Blom* and *Allee*. The district court did not abuse its discretion by denying additional funds.

III. Jury composition and selection

The district court assembled a 590-person venire drawn from across North Dakota, excluding the Grand Forks area. During voir dire, the court reduced this pool to 62 potential regular jurors and eight potential alternates. The court empaneled a jury of 12 persons and four alternates.

Rodriguez challenges the district court's jury selection plan, its rejection of two *Batson* challenges, and its exclusion of two venire members under *Witt*.

## A. Jury Selection Plan

Rodriguez alleges that African-Americans and Hispanics were under-represented in the venire, in violation of *Duren v. Missouri*, 439 U.S. 357 (1979), and the Jury Selection and Service Act, 28 U.S.C. § 1861. Allegations of racial discrimination in jury pools involve mixed questions of law and fact, and receive de novo review. **United States v. Morin**, 338 F.3d 838, 843 (8th Cir. 2003).

### 1. *Duren*

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." **U.S. Const. amend. VI**. "[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). In *Duren*, the Supreme Court held that "systematic exclusion" of women from jury venires violates the constitution's fair cross-section requirement. **Duren**, 439 U.S. at 360. To establish a *Duren* violation, Rodriguez must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364.

Rodriguez asserts that the district court's jury selection plan systematically excludes minorities by relying on lists of actual voters from the most recent

-14-

presidential election. As African-Americans and Hispanics in North Dakota participated in the 2004 election at lower rates than the state's whites, the proportion of minorities in the 590-person venire was lower than the overall proportion of minorities in North Dakota. The district court found Rodriguez met elements (1) and (2) of the *Duren* test.

Relying on Eighth Circuit case law, the district court held that, to establish *Duren* element (3), Rodriguez had to show minorities faced obstacles to voting in North Dakota. *See United States v. Greatwalker*, 356 F.3d 908, 911 (8th Cir. 2004) (per curiam); *Morin*, 338 F.3d at 844; *United States v. Garcia*, 991 F.2d 489, 492 (8th Cir. 1993).[5] "Absent proof that Native Americans, in particular, face obstacles to voter registration in presidential elections, [e]thnic and racial disparities between the general population and jury pools do not by themselves invalidate the use of voter registration lists and cannot establish the systematic exclusion of allegedly under-represented groups." *Morin*, 338 F.3d at 844 (quotations omitted).

Rodriguez offered no proof that minorities in North Dakota faced obstacles to voting. The *Duren* challenge fails under element (3).

2. Jury Service and Selection Act

The JSSA requires that "grand and petit juries [be] selected at random from a fair cross section of the community in the district or division wherein the court convenes." **28 U.S.C. § 1861**. A court may dismiss an indictment based on a JSSA violation. *Id.* **§ 1867(a)**.

---

[5]A panel of this court once criticized *Garcia*, arguing that using actual-voter lists under-represents minorities in jury pools. *United States v. Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996). The panel recognized, however, that it was bound by the court's prior decision, and the en banc court denied a petition for rehearing. *Id.* at 774.

This court "analyze[s] the [Jury Selection and Service] Act and the Sixth Amendment's fair-cross-section requirement under identical legal standards." *United States v. Sanchez*, 156 F.3d 875, 879 n.3 (8th Cir. 1998). *See also United States v. Di Pasquale*, 864 F.2d 271, 282 n.15 (3d Cir. 1988) (same); *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir. 1985) (same); *United States v. Test*, 550 F.2d 577, 584-85 (10th Cir. 1976) (same). Since the *Duren* challenge fails, so must the JSSA claim.

## B. *Batson* challenges

The government peremptorily struck Venireperson L.S., the only African-American among the 62 potential jurors, and Venireperson C.A., one of two Native Americans among the potential jurors. The district court rejected *Batson* challenges to both strikes. This court reviews the denial of *Batson* challenges for clear error. *United States v. Bolden*, 545 F.3d 609, 614 (8th Cir. 2008).

To establish a *Batson* violation:

> First, the defendant must make a prima facie case that the prosecution's strike was motivated by race; second, the prosecution must offer a race-neutral reason for the strike; and third, taking into account all the evidence, the trial court must find whether or not the prosecutor was motivated by purposeful discrimination.

*United States v. Spotted Elk*, 548 F.3d 641, 658 (8th Cir. 2008), *cert. denied*, 129 S.Ct. 1658, 2017, 2452 (2009), *citing Snyder v. Louisiana*, 128 S.Ct. 1203, 1207 (2008).

Rodriguez argues the district court failed to properly compare struck jurors with non-struck jurors. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that

-16-

is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." **Miller-El v. Dretke**, 545 U.S. 231, 241 (2005).

### 1. Venireperson L.S.

The district court found the government's peremptory strike of L.S., the only African-American in the 62-person eligible-juror pool, established a prima facie *Batson* violation. The government offered three race-neutral reasons for striking L.S.: (1) she held a theater arts degree, supposedly indicating liberal bias; (2) she stated in her questionnaire that she did not trust police because they harassed minorities; and (3) her brother spent 22 months in jail for assaulting a law enforcement officer. The district court accepted the government's reasons under the third step of the *Batson* test.

Rodriguez challenges the government's first reason, but not its second or third. Reviewing the voir dire record, this court concludes the district court did not clearly err by accepting the government's race-neutral reasons for striking L.S., which do not apply just as well to an otherwise-similar non-minority who served on the jury. *See* **United States v. Plumman**, 409 F.3d 919, 928 (8th Cir. 2005) (district court did not err by rejecting *Batson* challenge when "the prosecutor articulated multiple, non-discriminatory reasons for exercising peremptory challenges" and defense counsel failed to establish the reasons were a pretext for race discrimination).

### 2. Venireperson C.A.

The district court found a prima facie *Batson* violation based on the strike of Venireperson C.A., a member of the eight-person alternate juror pool and one of two Native Americans on the entire venire. During the second step of the *Batson* inquiry, the government gave three race-neutral reasons for striking C.A.: (1) his statement that capital punishment should be imposed only in extreme circumstances, (2) he is a

college professor, an allegedly liberal profession; and (3) his brother spent time in prison for assault.

Rodriguez attacks only one of the government's proffered reasons as pretextual. The district court's analysis under *Batson* step three, relying in part on C.A.'s family's criminal history, was not clearly erroneous. ***Plumman***, 409 F.3d at 928.[6]

## C. Jurors excluded under *Witt*

Rodriguez challenges the removal of two members of the venire based on their voiced concerns about the death penalty. "[A] potential juror may be excluded for cause based on his or her views on capital punishment only if those views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" ***United States v. Purkey***, 428 F.3d 738, 750 (8th Cir. 2005), *quoting* ***Wainwright v. Witt***, 469 U.S. 412, 420 (1985). "We review a district court's removal of death-scrupled venirepersons for an abuse of discretion." ***Id.***

### 1. Venireperson H.C.

H.C. testified during voir dire:

Q: Could you envision a case that you could fairly consider all the evidence and make a decision that the death penalty is appropriate?

---

[6]Rodriguez bases an alternative *Batson* argument on *Smulls v. Roper*, 467 F.3d 1108, 1114 (8th Cir. 2006), which has since been overruled. *See* ***Smulls v. Roper***, 535 F.3d 853, 856 (8th Cir. 2008) (en banc), *cert. denied*, 129 S.Ct. 1905 (2009). This court is bound by the en banc ruling.

A: I don't know. I'd probably — it would be questionable. I'd try to, but I really have trouble with the death penalty in any case, like I said, not even thinking about this case. So my impartiality might be skewed in that way.

. . . .

A: It's not just a feeling thing. It's just — nothing to do with this case. I do have trouble with the death penalty.

. . . .

A: Okay. Well, just having anything to say or do about putting someone to death, you know, is bothersome, just that statement. And then also, you know, just throughout the year that someone has been put to death and then data comes out later on, whether it be years later, you know, someone was innocent, then the patient — not patient but the person has been put to death.

Rodriguez asserts that H.C.'s testimony indicates he could follow the court's instructions, and thus was wrongfully excluded in violation of *Adams v. Texas*, 448 U.S. 38, 50-51 (1980). In *Adams*, the Supreme Court reversed the death penalty when Texas courts excluded prospective jurors "who stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." *Id.* at 49. "But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Id.* at 50.

Venireperson H.C.'s testimony indicated he would be more than simply "affected" by voting to impose the death penalty. He stated that his "impartiality might be skewed," that he had "trouble" with the death penalty, and that the penalty was "bothersome" because of post-execution exonerations. The district court did not abuse its discretion by removing H.C. under *Witt*. *See **United States v. Nelson***, 347 F.3d 701, 711-12 (8th Cir. 2003) (finding the district court did not err by removing prospective jurors under *Witt* when "the record reveals that each of the three

-19-

venirepersons would have had a great reluctance if not an actual inability to vote in favor of imposing the death penalty.").

## 2. Venireperson G.B.

G.B. testified during voir dire:

A: I've been a Lutheran Christian now since 1984 and I've tried to abide by the different — of the understanding of the church, first what the church believes on the death penalty. I know what the church believes on the death penalty is that they are against it.

. . . But I suppose that I could agree with those cases that do cry out for the death penalty in the first instance if it rises to a political — to making a political statement such as the death penalty for somebody like Hitler or Stalin or a person in Bosnia or —

Q: Genocide?

A: (Nods head.) Or some of that nature.

. . . .

Q: You've described the categories that you think are appropriate for the death penalty, correct?

A: (Nods head.)

Q: And you've gone through a number of them. I think you said mass murder, genocide, et cetera, et cetera, that we went through. Are there other categories that you would fit into that we missed that we didn't go over? . . .

A I don't think. I suppose my own understanding of cases that cry out for the death penalty would have to be not just one-on-one but would have to be more than, for example, as a serial case.

. . . .

Q: It sounds like you've arrived at yourself — for yourself a strong ethical and moral sense of the death penalty; that you've given it some thought over time. Would you agree?

A. Yes. It's not only my own but it's in conjunction with the church as well.

Venireperson G.B. repeatedly affirmed his deeply-held moral opposition to the death penalty, providing exceptions only for politically-motivated and serial killer cases. The district court did not abuse its discretion by removing him under *Witt*. *See United States v. Moore*, 149 F.3d 773, 780 (8th Cir. 1998) (no abuse of discretion to exclude, under *Witt*, jurors who "expressed serious doubt as to their ability to consider imposition of the death penalty").

## IV. Evidentiary challenges

Rodriguez challenges evidentiary rulings in the guilt and penalty phases. He appeals: (a) the admission, during the guilt phase, of acid-phosphate evidence under Fed. R. Evid. 702; (b) the admission, during the guilt phase, of two prior sexual assault convictions under Fed. R. Evid. 413; and (c) testimony, during the penalty phase, of victim-impact witnesses. This court reviews evidentiary rulings for abuse of discretion. *United States v. James*, 564 F.3d 960, 963 (8th Cir. 2009).

## A. Guilt phase: acid-phosphate testing

The district court permitted a government pathologist to testify, over objection, about the results of acid-phosphate tests conducted on Dru Sjodin's body, indicating the presence of semen in her vagina and cervix. Rodriguez argues this testimony violates *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). This court reviews the district court's expert-witness rulings for abuse of discretion. *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008).

*Daubert* holds that Fed. R. Evid. 702 supersedes the expert witness standard of *Frye v. United States* 293 F. 1013, 1014 (D.C. Cir. 1923). *Daubert*, 509 U.S. at 589.

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**Fed. R. Evid. 702**.

"Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. To determine whether a testimony is "scientific knowledge," the court considers four non-exclusive factors: (1) whether the theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," and (4) "general acceptance" of the theory or technique. *Id.* at 593-94. "'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence — especially Rule 702 — do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id.*

The district court conducted a *Daubert* hearing on acid-phosphate testing. Permitting the pathologist's testimony, the court noted that Rodriguez's own expert acknowledged that the government pathologist's test properly detects the presence of acid phosphate; that forensic labs across the country use acid-phosphate levels to indicate semen, and use the same cut-off levels as the government pathologist; and that while there is uncertainty about what acid-phosphate levels would be normal for

a corpse, many pathologists share the government pathologist's view of the reliability of the test, and any doubts go to the weight, not reliability, of the opinion.

Challenging the testimony, Rodriguez first asserts the acid-phosphate testimony was based on the pathologist's own experience, rather than peer-reviewed research. *Daubert* emphasizes that while peer-reviewed publication is a factor, "in some instances well-grounded but innovative theories will not have been published." *Id.* at 593. The government's expert, a licensed medical doctor with three decades' experience, became the chief examiner of the Hennepin County Medical Examiner's office in 1985. He regularly participates in criminal investigations, including sex crimes, and testifies at trials. The pathologist did not invent acid-phosphate testing; he testified to attending national medical conferences and reviewing scientific literature on the topic. The test results are based on scientific methods and data, and assist the jury in its fact-finding. The district court did not abuse its discretion by admitting the acid-phosphate test results.

Rodriguez next challenges the factual basis of the pathologist's conclusion that acid-phosphate tests show semen deposits were made within 24-to-36 hours of Sjodin's death. The pathologist stated that acid-phosphate levels were elevated in her vagina and cervix and that, in a living person, elevated levels drop to normal within 24-to-36 hours of the semen's deposit. Because Sjodin's body was covered in snow until its discovery, the pathologist testified that "the cold environment has to be taken into account regarding the preservation of the specimens we found at the sexual assault exam." Cross-examined about the timing of this process, he stated:

> The process continues or is the same in a deceased individual only much slower. Therefore, if you use the same process taking place in a deceased individual as in a living individual, you can say the enzyme will break down over a more slower period of time. And I think some

of the literature reports it going out as far as four to five days depending on the reports you read.

Rodriguez asserts that the district court erred by allowing this testimony, claiming the time-frame testimony was unreliable. The pathologist based his testimony on acid-phosphate measurements in living people. He acknowledged there could be uncertainty about the factual basis of the timing of the chemical process in a corpse.

> [T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine. Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) (citations and quotations omitted). Rodriguez's challenge — developed with thorough cross-examination — goes to credibility, not admissibility. The court did not abuse its discretion by allowing the testimony.

Rodriguez also attacks the district court's characterization of the views of the government pathologist and Rodriguez's expert as two schools of thought on acid-phosphate testing. Instead, Rodriguez asserts, only his expert's position is supported by scientific literature. This argument is contradicted by the testimony of Rodriguez's expert, who acknowledged widespread support among American scientists for the government pathologist's approach. Admission of the pathologist's testimony was not an abuse of discretion.

B. Guilt phase: Rule 413 convictions

"In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." **Fed. R. Evid. 413(a)**. The district court admitted, during the guilt phase, evidence of two prior convictions under Rule 413.

Rodriguez asserts Rule 413 is unconstitutional, in violation of the Due Process Clause, by not expressly incorporating Rule 403's prohibition against admission of unfairly prejudicial evidence. *See* **Fed. R. Evid. 403**; **U.S. Const. amend. V**. This court has ruled, however, that Rule 403's relevance-prejudice balancing test applies to evidence admitted under Rule 413. *United States v. Mound*, 149 F.3d 799, 800-801 (8th Cir. 1998). *Mound* forecloses the constitutional challenge to Rule 413.

Rodriguez also contends the district court abused its discretion by admitting evidence under Rule 413. During the guilt phase, the government sought to introduce evidence of four prior sexual assaults — Minnesota state convictions 5438, 5447, and 6192, and a charged count on which Rodriguez was acquitted. The government argued that all four incidents show a modus operandi of approaching young women, when alone, and using violence (or the threat of violence) in an actual or attempted sexual assault.

Rule 413 permits evidence of relevant "sexual assaults." A relevant sexual assault is one committed in a manner similar to the charged offense. *United States v. Crawford*, 413 F.3d 873, 875-76 (8th Cir. 2005). The district court admitted evidence of the 5438 and 5447 convictions under Rule 413, but excluded evidence of the 6192

conviction and the acquitted count. The court reasoned that Rodriguez's conduct in the 6192 case showed a kidnapping attempt, not a sexual assault, and thus was insufficiently similar and therefore not relevant. Applying Rule 403, the court excluded evidence of the acquitted count, concluding it is unfairly prejudicial to admit evidence of a crime where the jury did not convict.

The court admitted the 5438 and 5447 convictions under Rule 413, allowing the victims to testify about Rodriguez's conduct. In both cases, Rodriguez approached a young woman by herself, forced her into a vehicle under threat of violence, and sexually assaulted her. Here, the government alleged Rodriguez approached Sjodin while alone in a parking lot, abducted her at knife point, forced her into a car, and sexually assaulted her before murdering her.

This court addressed a similar Rule 413 challenge in *United States v. Horn*, 523 F.3d 882, 888 (8th Cir. 2008). There, this court affirmed the admission, under Rule 413, of a prior rape conviction. *Id.* Despite significant age differences between the victim of the prior conviction and those of the two charged offenses, all incidents involved sexual assaults of unconscious victims where the attacks ceased when the victims reacted. *Id.* Like the *Horn* conviction, the 5438 and 5447 convictions involved conduct similar to the charged offense here. The district court did not abuse its discretion by admitting convictions 5438 and 5447 under Rule 413.[7]

---

[7]Rodriguez also alleges the district court did not evaluate the 5438 or 5447 convictions under Rule 403. The district court's order discusses all four criminal charges the government sought to introduce under Rule 413, and strikes two under Rule 403. The court's order sufficiently addresses the Rule 403 challenge.

-26-

C. Penalty phase: victim-impact testimony

Rodriguez asserts that the government's victim-impact evidence, introduced during the penalty phase, violates the Due Process Clause, the Federal Death Penalty Act (FDPA), and the district court's order. *See* **U.S. Const. amend. V**; **18 U.S.C. §§ 3591, 3592, 3593**. This court reviews de novo constitutional challenges and questions of statutory interpretation. ***United States v. May***, 535 F.3d 912, 915 (8th Cir. 2008), *cert. denied*, 129 S.Ct. 2431 (2009).

Under the FDPA, the government may prove, to justify a death sentence, "factors concerning the effect of the offense on the victim and the victim's family," including "oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." **18 U.S.C. § 3593(a)**. "Evidence 'about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed [and t]here is no reason to treat such evidence differently than other relevant evidence is treated.'" ***Bolden***, 545 F.3d at 626, *quoting* ***Payne v. Tennessee***, 501 U.S. 808, 827 (1991). "However, admission of evidence 'so unduly prejudicial that it renders the trial fundamentally unfair' violates the Due Process Clause." ***Id., quoting Payne***, 501 U.S. at 825.

Permitting some victim-impact testimony, the district court limited it to factual statements subject to cross-examination, rather than statements of love or emotion. The government called six victim-impact witnesses, including three family members. Rodriguez contends that several statements contain improper expressions of emotion.

The challenged comments include testimony about Sjodin's good nature and popularity, her sorority sisters' reactions when her body was found, and a non-family member's impressions about the effect of the crime on Sjodin's family. Her father testified about the last time he saw his daughter, and not working for five months after her disappearance in order to search for her. Sjodin's stepfather discussed the impact of the crime on him and his wife, including work-related disruptions. Sjodin's mother spoke about her good nature and her relationship with her brother.

In *United States v. Nelson*, the government presented six victim-impact witnesses, including three family members. **United States v. Nelson**, 347 F.3d 701, 712-13 (8th Cir. 2003). "A fair summation of their collective testimony is that the witnesses provided emotional and, on occasion, tearful testimony about Pamela and the impact of her murder on their lives." **Id.** at 713. This court affirmed the penalty, noting that victim-impact testimony was neither quantitatively nor qualitatively overwhelming. **Id.** at 713-14.

Here, the government presented six victim-impact witnesses, including three family members. The testimony was, on the whole, factual; witnesses explained the effect of Sjodin's abduction and murder on their lives. Although the record shows some testimony was emotional, *Nelson* instructs that a district court does not abuse its discretion by denying a mistrial motion when victim-impact testimony has some emotional content. *See **id**. Rodriguez himself presented numerous mitigation witnesses who testified about the value of his life and the emotional pain his execution would cause them. Reviewing the record, this court concludes that victim-impact testimony was not overwhelming, and any testimony that improperly conveyed emotion was harmless error. *See **United Staes v. Paul**, 217 F.3d 989, 1002 (8th Cir. 2000) (rejecting challenge to victim-impact testimony and noting that the defendant

-28-

"was also able to present extensive mitigating evidence through the testimony of his mother").

Rodriguez also objects to the victim's father shaking hands with the prosecutor in the presence of the jury, immediately after the father's testimony. This court has not previously considered whether a defendant is unfairly prejudiced by a prosecutor shaking hands with a witness in the jury's presence. The Ninth Circuit addressed this issue in *United States v. Rude*, 88 F.3d 1538, 1549 (9th Cir. 1996). Finding no error, that court observed "our research revealed no case suggesting it is improper for a prosecutor, without more, simply to shake hands with a witness upon the close of his testimony in the jury's presence." *Id.* "A prosecutor's open handshake with a witness neither lends governmental imprimatur to his testimony nor personally assures the jury of its credibility." *Id.*

A prosecutor may not vouch for the veracity of government witnesses' testimony. *See **United States v. Kenyon***, 481 F.3d 1054, 1066 (8th Cir. 2007) ("Improper vouching may occur when the government . . . refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury."). Here, however, the handshake did not improperly bolster the witness's testimony, or suggest that the Sjodin family desired a sentence of death.

## V. Government's penalty-phase closing argument

Rodriguez challenges a variety of statements in the government's penalty-phase closing argument. To obtain reversal for prosecutorial misconduct, a defendant must show the prosecutor's remarks were improper, and that such remarks prejudiced the defendant's rights in obtaining a fair trial. ***United States v. Two Elk***, 536 F.3d 890, 906 (8th Cir. 2008).

## A. Relevance of mitigating factors

Rodriguez contends that, several times in closing, the government misled the jury about the relevance of mitigating factors. "[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "[T]he sentencer in capital cases must be permitted to consider any relevant mitigating factor . . . ." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (citations omitted). *See Smith v. Texas*, 543 U.S. 37, 44 (2004) ("petitioner's IQ scores and history of participation in special-education classes" were proper mitigating factors).

Rodriguez first challenges this statement:

> Ask yourself what has the defense proven that actually has the power to change what the Defendant did in this case and erase who he is?
>
> And Judge Erickson just told you as to those mitigating factors where the burden lies. . . . [then, six transcript pages later]
>
> . . . .
>
> For the first time in this trial the law now says the defense has a burden of proof, and if you look at it closely, the burden has two components, as Judge Erickson's instructions bear out. No mitigating information goes on the scale unless the defense meets its proof burden and you first reach a couple of conclusions. The burden of proving mitigation is on the defense to show the mitigation allegation is factually proven to the greater weight of the evidence.

-30-

Also, the information has to be shown that the information mitigates in this case. Whether proven or not, does it mitigate, tend to lessen the severity in this case? A defense proposal for mitigation or mitigation that you find is only qualified to go on the decision scale if you answer yes for both of those mitigation questions, and then there's a third issue, what weight do you want to give it?

If either of those first two is not proven, either factually or that it mitigates, then you don't have to give further consideration to that proposed factor.

Rodriguez also challenges several statements where the government discussed the proposed mitigating factors. The government argued, for instance:

We heard that the Defendant was a colicky baby, he was one of the poor kids in school, some kids teased him, and he is said to have encountered racism and sexual abuse, as did his sisters. Very serious matters. He inherited a benign hand tremor from his father, and he would rather have lived in Texas than Minnesota. Perhaps these factors would mitigate the Defendant getting into a fistfight with one of the people who wronged him long ago, but what could it have to do with a 22-year-old girl the Defendant spotted in a mall, lusted after, kidnapped, assaulted and raped, and finally killed on November 22nd, 2003?

No matter what the Defendant thinks he would change about his life, everyone agrees he is capable of choosing for himself. There's nothing in the law that allows him to choose to do what he did to Dru Sjodin and his other victims, and there is nothing that says you are required to agree to it by way of his mitigation claims.

Rodriguez asserts these comments improperly directed the jury to consider mitigation evidence only if it has a "nexus" to the crime.[8]

---

[8]Rodriguez also cites several government statements made to the district court out of the presence of the jury. These statements do not establish prejudice.

The FDPA authorizes a jury to impose a death sentence "after consideration of the factors set forth in section 3592." **18 U.S.C. § 3591(a)**. Section 3592 lists both mitigating and aggravating factors. *See id.* **§ 3592(a), (c)**. "The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death." *Id.* **§ 3593(c)**. "The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." *Id.* Further, "as long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007), *cert. denied*, 129 S.Ct. 32 (2008).

Rodriguez had the burden of proving mitigating factors. **18 U.S.C. § 3593(c)**. The government may dispute those factors, and argue they should receive little or no weight. *Id.*; *Johnson*, 495 F.3d at 978. The first challenged remarks, quoted above, accurately state the law: Rodriguez had to prove mitigating factors; the jury should consider only those mitigating factors proved by a preponderance of the evidence; and the jury could decide that any mitigating factors, even if proved, are sufficiently outweighed by aggravating factors.

The second challenged remarks do not direct jurors to disregard mitigating factors because no nexus links them to the killing. Rather, the prosecutor argued that, despite Rodriguez's troubled past, "he is capable of choosing for himself" and has free will. This argument is permissible. *See Johnson*, 495 F.3d at 979 (finding no error when "[t]he prosecutor was arguing . . . that she [the defendant] had free will and an opportunity to make the right choices, her difficult childhood notwithstanding.").

-32-

## B. Alleged misstatement of law

Rodriguez contends the government improperly argued that Rodriguez would receive a life sentence for kidnapping alone, and that a death sentence was necessary to punish him for the murder. The government argued that Rodriguez "could get the same punishment," a life sentence, if he only kidnapped Sjodin, transported her across state lines, and let her go. The district court sustained Rodriguez's objection to this and a similar comment. *Cf. Rodden v. Delo*, 143 F.3d 441, 447 (8th Cir. 1998) ("In context, the prosecutor's statements about the second murder being free urged the jury to impose additional punishment for the additional crime.").

The government misstated the law, Rodriguez asserts, as the jury could impose either life imprisonment or death for a kidnapping resulting in death. *See* **18 U.S.C. § 1201(a)**. The district court sustained his objection, however, and instructed the jury on its sentencing options. On this record, Rodriguez was not unfairly prejudiced by the remarks, and the district court did not abuse its discretion by denying the motion for a mistrial. *See United States v. Boesen*, 541 F.3d 838, 847 (8th Cir. 2008) (district court did not abuse its discretion by denying mistrial when it sustained defense objection to prosecutor's statement).[9]

## C. Impact on the Rodriguez family

Rodriguez argues the government improperly directed the jury to disregard the impact of a death sentence on the Rodriguez family. The prosecutor stated:

---

[9]The separate opinion asserts that the government emphasized a theme of duty throughout closing, and claimed the law required a penalty of death, *post* at 66-67. This assertion does not appear in Rodriguez's briefs, nor was it raised at trial. Under the plainest of plain error review, the prosecutor did not minimize the jury's role, as occurred in *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (improper to argue that automatic appeal relieves jurors of responsibility), nor equate the jurors with soldiers following orders, as in *Weaver v. Bowersox*, 438 F.3d 832, 840 (8th Cir. 2006).

This is the time for punishment. Punishment. And let me caution you respectfully, and I mean this respectfully, the issue of punishment for the Defendant is not an issue of how it affects his family, not under the law.

The district court overruled Rodriguez's objection, instructing the jury:

I have instructed this jury on what the mitigating factors are alleged and if proven what they may consider and what weight they may assign to it. This is an argument. I'll overrule the objection and instruct the jury to any arguments that are made by either counsel should be taken in light of the instructions that I have given.

The prosecutor continued:

The Rodriguez family is entitled to the sadness that they have expressed for the Defendant. They gave this Defendant every chance they could across the many years. But his choices have brought them here to this place.
        And when you consider the Defendant's list of proposed mitigation, the United States respectfully urges you to conclude that the pain that his intentional acts have caused his family should not be allowed to weigh in his favor now; that he could benefit from what he has caused would be a gross injustice.

The FDPA permits a defendant to propose "any mitigating factor." **18 U.S.C. § 3592(a)**. Rodriguez proposed six mitigating factors addressing the emotional pain different family members would suffer if he were executed. The jury instructions explained: "you must consider whether the aggravating factors that you unanimously found to exist, both statutory and non-statutory, sufficiently outweigh any mitigating factors that you found . . . so that a sentence of death is justified."

The first quotation, read alone, directs that family-impact mitigating factors are irrelevant "under the law." A prosecutor errs by directing the jury to ignore a proposed mitigating factor. *See **Bolden***, 545 F.3d at 630 ("[A]s long as the jurors are not told

to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight.") (citation omitted).

In the context of the entire exchange — the court's instruction to the jury when overruling the objection, and the government's renewed argument — the government's argument is clearer. The prosecutor recognized the pain that an execution would cause the Rodriguez family, but argued that such pain should receive little weight when determining the appropriate penalty. This argument is permissible.

The jury's penalty-phase verdict shows it did not ignore the family-impact mitigation factors. It unanimously found that six members of Rodriguez's family "will suffer emotional pain if Alfonso is executed." Weighing these factors against the aggravating factors, however, the jury imposed a death sentence.

This court concludes that, when read in context, the prosecutor's comments were not improper. Even if the first comment is taken in isolation, however, Rodriguez's right to a fair trial was not affected. In response to the objection, the court focused attention on the jury instructions, which direct the jury to consider each proposed mitigation factor and to balance all factors. Finally, the jury's verdict, which found six family-impact mitigation factors, indicates the jury did not erroneously disregard the factors as irrelevant "under the law."

D. References to plea offer

The district court admitted Rodriguez's offer to plea guilty, in return for a life sentence, as a proposed mitigating factor showing acceptance of responsibility. *See* **18 U.S.C. § 3592(a)** (When imposing sentence, the jury may consider "any mitigating factor," including "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death

sentence."). No juror found that, by offering to plead guilty, Rodriguez accepted responsibility for the crime.

The court ruled that the government's response to Rodriguez's offer was inadmissible, but that the government could explain the timing of the offer to plead. During penalty-phase closing, the government three times began to reference its rejection of Rodriguez's offer to plea guilty in exchange for a life sentence. The court sustained Rodriguez's objection each time, and denied Rodriguez's motion for a mistrial.

"The district court has the discretion to decide whether the government's actions so tainted a trial that a mistrial should be declared." *United States v. Bordeaux*, 436 F.3d 900, 904 (8th Cir. 2006). This court reviews the denial of a mistrial motion for abuse of discretion. *United States v. Encee*, 256 F.3d 852, 854 (8th Cir. 2001).

Here, two of the three statements began to address the timing of the plea offer, information the district court had ruled admissible. After reviewing the record, this court concludes the jury did not hear any improper statements about Rodriguez's offer to plead guilty. Rodriguez was not unfairly prejudiced by the comments, and the district court did not abuse its discretion by denying the mistrial motion. *See Boesen*, 541 F.3d at 847.

### E. Denigration of the mitigation case

Rodriguez contends the government wrongfully denigrated the proposed mitigation case, citing two statements from the closing argument. In the first statement, the government responds to a defense witness's testimony about Rodriguez's appearance as a child, stating:

Dr. Hutchinson took a look at the childhood photograph of the Defendant and proclaimed his head to be big. Big compared to what? Big how? No measurements. No medical records or doctors who examine the Defendant. Nothing direct. Just inferences. Just mentioned it. What utter nonsense in a court of law. This is the nature of the case in mitigation. Put it up, hope it sticks.

Dr. Hutchinson claimed that when kids have big heads, that sometimes can signify autism or retardation. Of course, you recall that Mr. Reisenhauer caught that and asked Dr. Hutchsinon whether she was now claiming or had any evidence that the Defendant is autistic or retarded. No was answer, neither of those. She should guess not.

A prosecutor should not disparage an opponent's argument with comments like, "put it up, hope it sticks." In context, however, the substance of this statement responds to a defense contention. Rodriguez argued at some length, aided by several experts, that in early childhood he demonstrated signs of mental incapacity. "When the defendant's attorney offers a theory of defense . . . the government may respond by noting the absence of evidence to support that defense." *United States v. Burns*, 432 F.3d 856, 861 (8th Cir. 2005). The comments, in whole, were not error. *See United States v. King*, 554 F.3d 177, 181 (1st Cir.), *cert. denied*, 129 S.Ct. 2169 (2009) (reversal not required based on prosecutor's closing argument that defendant was "throw[ing] as much garbage against the wall and hop[ing], beyond all hope, that something sticks."); *United States v. Bossinger*, 311 Fed. Appx. 512, 515 (2d Cir. 2009) (while inappropriate, prosecutor's comment that the defendant was "just throw[ing] stuff up in the air and hop[ing] something sticks" did not require reversal).

Second, Rodriguez challenges the government's comment, "regardless of what defense experts are trying to sell you in this case," Rodriguez acted with free will when abducting and murdering Sjodin. "Improper comments made by a prosecutor during closing argument may be grounds for reversing a conviction but only if those comments prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." *United States v. Thompson*, 560 F.3d 745, 750 (8th Cir. 2009)

(quotations and citation omitted). Rodriguez did not make a contemporaneous objection, but cited this comment in his motion for a mistrial or new trial. This court reviews for plain error. **Fed. R. Crim. P. 52(b)**.

This court agrees with the district court that this remark was inappropriate. Defense counsel was not "selling" a case, but was instead providing constitutionally required assistance to an accused. **U.S. Const. amend. VI**. In the context of a criminal trial spanning several weeks, however, this comment did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997); **Fed. R. Crim. P. 52(b)**. *See United States v. Lopez*, 414 F.3d 954, 960 (8th Cir. 2005), *rev'd in part on other grounds*, *United States v. Lopez*, 443 F.3d 1026 (8th Cir. 2006) (en banc) (finding prosecutor's comment about defense attorney's "slick tactics" was improper, but holding that mistrial was not required).

## F. "Golden rule" argument

Rodriguez asserts the government made an improper "golden rule" closing argument, asking jurors to imagine themselves in the place of the victim. "A prosecutor may not express an opinion implying knowledge of facts unavailable to the jury." *Roberts v. Delo*, 205 F.3d 349, 351 (8th Cir. 2000). "[I]t is improper to ask jurors to put themselves in the place of the victim." *Id.*

Here, the prosecutor asked the jury to imagine "what Dru went through," including the "raw fear of what would be her fate as the Defendant drove her into the night . . . ." The first clause is a permissible request. The government charged, as an aggravating factor, the manner in which Rodriguez committed this offense. *See* **18 U.S.C. § 3592(c)(6)** ("The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the

victim."). The government introduced evidence of what Sjodin went through —
abduction, sexual violence, murder — and could request the jury to consider such
evidence when imposing punishment.

The second clause — Sjodin's "raw fear" — was impermissible, but not
because it violated the Golden Rule. The error is that the government introduced no
evidence of Sjodin's fear. Having reviewed the record, this court concludes this brief
remark, although improper, did not affect Rodriguez's substantial rights. **Fed. R.
Crim. P. 52(a)**.

Rodriguez also challenges this statement in the prosecutor's closing argument:

Ladies and gentlemen, I told you in my first closing argument, my first
closing comments, that Dru Sjodin is right here with us in all that the
evidence represents about this case and everything that happened to her
and everything that he did to her, everything that he intentionally
inflicted on her. Well, Dru Sjodin is here, but I must speak for her.

Rodriguez asserts the prosecutor's claim to "speak for" Sjodin was an improper appeal
to emotion.

Courts disagree whether a defendant is unfairly prejudiced by a prosecutor's
statement that she "speaks for" a victim. *Compare* ***Sanchez v. State***, 41 P.3d 531, 535
(Wyo. 2002) (prosecutor did not err by telling jury: "You and I get to speak for" the
victim); ***State v. Braxton***, 531 S.E.2d 428, 455 (N.C. 2000) (holding that prosecutor
does not err by arguing that he speaks for victim); ***Henderson v. State***, 583 So.2d 276,
286 (Ala. App. 1990) ("we find no reversible error in a brief statement suggesting that
the prosecuting attorney speaks for the victim's family"); *with* ***United States v.
Lowder***, 5 F.3d 467, 473-74 (10th Cir. 1993) (although the comment did not deprive
the defendant of a fair trial, prosecutor made an improper comment to the jury by

stating: "Who gets left out?  The victims get left out.  They don't get anybody to talk for them."); *People v. Brown*, 624 N.E.2d 1378, 1388, 1391-92 (Ill. App. Ct. 1993) (prosecutor's statement that "we speak for the victims in this case" was irrelevant to defendant's guilt, and while no single trial error required reversal, cumulative error did); *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. App. 1992) (although the comment did not require reversal, prosecutor made an improper statement by arguing: "The victim, Mr. Booker, isn't here to speak for himself and able or not, it is my job to speak for Mr. Booker and Mr. Booker was a man with a family.").

This court concludes that a prosecutor's brief claim to "speak for" a victim is improper if, in the context of surrounding statements, the comment appeals excessively to jurors' emotions.  Here, the surrounding statements focused jurors' attention on the government's evidence, not on sympathy for Sjodin or her family.  The comment was not improper.

### G. Criminal history

Rodriguez objects to references in the government's closing argument to his criminal history, claiming they misrepresented the extent and nature of his prior convictions.  The prosecutor referred to Rodriguez as "a multiple rape Defendant," someone who had committed a "string of rape attacks."  Rodriguez asserts error, noting that he has only one prior conviction for rape.  The indictment charges, as an aggravating factor, prior convictions for attempted aggravated rape, aggravated rape, attempted kidnapping, and first degree assault.

The government's assertion that Rodriguez committed "a string of rape attacks" is accurate; rapes and attempted rapes are both "rape attacks."  Moreover, the government was permitted to argue that the evidence here shows Rodriguez raped Sjodin before killing her.  To the extent characterizing Rodriguez as a "multiple rape

-40-

Defendant" incorrectly implies that he has multiple prior convictions for rape — as opposed to prior convictions for rape, attempted rape, and assault (of a female), in addition to sexually assaulting the victim in this case — any error, if error at all, is harmless. **Fed. R. Crim. P. 52(a)**.

## H. Cumulative error

Finally, Rodriguez alleges that errors in the government's penalty-phase closing argument, when aggregated, deprived him of a fair trial. When reviewing the denial of a mistrial motion, this court considers (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. *United States v. Chase*, 451 F.3d 474, 481 (8th Cir. 2006).

The closing-argument errors found by this court had a small effect in this case, which was long and filled with overwhelming evidence of Rodriguez's guilt and the violence of Sjodin's abduction and murder. *See United States v. Higgs*, 353 F.3d 281, 331 (4th Cir. 2003) ("The complained-of comments were isolated, did not rise to the level of argument that might mislead or inflame the jury concerning its duty or divert it from its task, and were made in the context of a case involving compelling evidence of numerous aggravating factors."). The district court did not abuse its discretion by denying the motion for a mistrial.

## VI. 18 U.S.C. § 3592(c)(4) aggravating factor

The indictment charged, as an aggravating factor, 18 U.S.C. § 3592(c)(4), which requires the government to prove "[t]he defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the

-41-

infliction of, or attempted infliction of, serious bodily injury or death upon another person." The government charged three qualifying convictions under § 3592(c)(4), identified here by their Minnesota state case numbers: (1) conviction 5438 (attempted aggravated rape, in 1974); (2) conviction 5447 (aggravated rape, in 1974); and (3) conviction 6192 (attempted kidnapping and first degree assault, in 1980).

Rodriguez argues the district court erred by denying his requests to strike the § 3592(c)(4) convictions by: (a) applying the wrong legal standards, (b) admitting unreliable evidence of the 5438 and 5447 victims' injuries, and (c) wrongly excluding evidence of the 6192 victim's injuries.[10]

## A. *Taylor v. United States*

Rodriguez challenges allowing the government to present, to the jury, convictions 5438 and 5447 to prove the § 3592(c)(4) factor. Instead, he asserts the court should have decided whether the convictions prove the § 3592(c)(4) factor by applying the categorical approach of *Taylor v. United States*, 495 U.S. 575 (1990). Under *Taylor*, "the sentencing court looks to the fact of conviction and the statutory

---

[10]Rodriguez also asserts that the district court should have dismissed the indictment because of prosecutorial misconduct before the Grand Jury concerning the § 3592(c)(4) factor. "Even if we were to assume there was prosecutorial misconduct during the grand jury proceedings, the petit jury's guilty verdict rendered those errors harmless." **United States v. Sanders**, 341 F.3d 809, 818 (8th Cir. 2003). "Except in cases involving racial discrimination in the composition of the grand jury, a guilty verdict by the petit jury excuses errors at the grand jury level that are connected with the charging decision." *Id.* at 818-19 (quotations and citations omitted). The petit jury's verdict renders "any error in the grand jury proceeding connected with the charging decision . . . harmless beyond a reasonable doubt." *Id.* at 819, *quoting* **United States v. Exson**, 328 F.3d 456, 460 (8th Cir. 2003), *quoting* **United States v. Mechanik,** 475 U.S. 66, 70 (1986).

definition of the prior offense and determines whether the full range of conduct encompassed by the state statute qualifies to enhance the sentence." **United States v. Sonnenberg**, 556 F.3d 667, 670 (8th Cir. 2009), *citing Taylor,* 495 U.S. at 600. If the statute criminalizes conduct that would qualify as a predicate offense, as well as conduct that would not, the court may refer to the charging document, the terms of a plea agreement, the transcript of the colloquy, jury instructions, and other comparable judicial records to determine the basis for the guilty plea or verdict. **Id.,** *citing* **Shepard v. United States***,* 544 U.S. 13, 26 (2005).

The district court held that *Taylor* does not apply to FDPA statutory aggravating factors, and that the jury should determine if the government's evidence prove § 3592(c)(4)-qualifying prior offenses. Victims of the 5438 and 5447 convictions testified during the penalty phase about their injuries. The jury found that Rodriguez caused "serious bodily injury" to both victims, making him death-eligible under § 3592(c)(4). This court reviews de novo the district court's interpretations of law. **United States v. Elzahabi**, 557 F.3d 879, 883 (8th Cir.), *cert. denied*, 129 S.Ct. 2781 (Jun. 8, 2009).

The district court based its ruling, in part, on the fact that § 3592(c)(4) applies if the defendant has two prior convictions "involving the infliction of, or attempted infliction of, serious bodily injury." The court reasoned that the word "involving," as used in § 3592(c)(4), suggests fact-finding beyond the *Taylor* and *Shepard* approaches. *See* **Higgs**, 353 F.3d at 316 ("Because the language quite plainly requires only that the previous conviction 'involv[e] the use or threatened use of a firearm,' it authorizes and likely requires the court to look past the elements of the offense to the offense conduct.").

Rodriguez counters that courts apply *Taylor* analysis to several criminal statutes using the word "involve." *See, e.g.*, **United States v. McCall**, 439 F.3d 967, 970 (8th Cir. 2006) (en banc) (applying *Taylor* analysis to the "otherwise involves" clause of

the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii)).[11] He also cites a recent Supreme Court decision finding *Taylor* analysis inapplicable to a statute reaching a conviction that "involves fraud or deceit *in which the loss to the victim or victims exceeds $10,000.*" **Nijhawan v. Holder**, 129 S.Ct. 2294, 2298 (2009), *quoting* **8 U.S.C. § 1101(a)(43)(M)(i)**. *Nijhawan* relies, in part, on the absence of fraud or deceit statutes with $10,000 thresholds. *See id.* at 2301. Rodriguez asserts that, unlike references to fraud or deceit above $10,000, "serious bodily injury" refers to a defined class of crimes, and therefore *Taylor* analysis must be applied to § 3592(c)(4). He urges this court to follow the district court's ruling in *United States v. Smith*, 2007 WL 2668883, at *3-*5 (E.D. La. Sept. 5, 2007), which applies *Taylor* analysis to a § 3592(c) death penalty sentencing factor.[12]

Neither *McCall* nor *Nijhawan* addresses the issue here. Because the meaning of "involving" does not resolve the issue, this court examines the structure and language of the statute. First, unlike sentence enhancements under the ACCA, a sentence of death does not automatically result if the defendant has qualifying predicate offenses under § 3592(c)(4). Rather, if the jury finds at least one § 3592(c) factor, it may — but does not automatically — impose the death penalty after weighing aggravating factors against mitigating factors. *See* **18 U.S.C. § 3591** (a defendant "shall be sentenced to death if, after consideration of the factors set forth

---

[11]In *McCall*, this court held that the state law crime of driving while intoxicated is a "violent felony" under the ACCA. **McCall**, 439 F.3d at 972-73. Following *Begay v. United States*, 128 S.Ct. 1581, 1588 (2008), this court vacated its ruling in *McCall*, and remanded the case to the district court. **United States v. McCall**, 523 F.3d 902 (8th Cir. 2008), *vacating* 507 F.3d 670, 675 (8th Cir. 2007).

[12]*Smith* addresses a different subsection, 18 U.S.C. § 3592(c)(2), which applies if "the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person."

in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified"). Becoming eligible for a sentence, as opposed to automatically receiving one — an important structural difference between § 3592(c)(4) and the ACCA — counsels against applying *Taylor* analysis to the screening function of § 3592(c)(4).

Second, unlike the ACCA, the FDPA mandates a fact-intensive process in death-eligible proceedings. In advance of trial, the government must set forth the aggravating factor or factors that it "proposes to prove as justifying a sentence of death." **18 U.S.C. § 3593(a)(2)**.

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

*Id.* § 3593(a). When a defendant is found guilty of a death-eligible offense, no Pre-Sentence Report is prepared. *Id.* § 3593(c). Instead, during the penalty phase, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." *Id.*

Beyond the FDPA, the factual inquiry required in death penalty cases has constitutional significance. "[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878 (1983). "What is important at the selection stage is an

*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 878-79.

Factual inquiry is not permitted under the ACCA. *See Taylor*, 495 U.S. at 601 (noting that, under the ACCA, "the practical difficulties and potential unfairness of a factual approach are daunting"). Factual inquiry is required in death penalty sentencing. *Zant*, 462 U.S. at 878-79. *Taylor* prohibits relying on witness testimony in ACCA cases; the FDPA expressly permits witnesses to testify. In *Taylor* cases, Pre-Sentence Reports are prepared, allowing advance opportunity to dispute prior convictions. PSRs are not prepared in death penalty cases. **18 U.S.C. § 3593(c)**. This court concludes that *Taylor* analysis is inapplicable to the § 3592(c)(4) factor, which should instead be submitted to the jury.[13]

### B. Sufficiency of evidence showing "serious bodily injury"

Section 3592(c)(4) applies if the defendant has at least two prior convictions "involving the infliction of, or attempted infliction of, serious bodily injury . . ." **18 U.S.C. § 3592(c)(4)**. The government called the 5438 and 5447 victims to testify about the injuries they suffered. Rodriguez contends this testimony is insufficient to show the infliction or attempted infliction of serious physical injury. "In reviewing the sufficiency of the evidence supporting an aggravating factor, we consider whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." *Bolden*, 545 F.3d at 615 (quotations and citations omitted).

---

[13]This court's conclusion comports with the only circuit decision addressing this issue. *Higgs*, 353 F.3d at 316-17.

-46-

## 1. The 5438 victim

The 5438 victim testified that she grew up in Crookston, knew Rodriguez as an adolescent, and agreed to his request for a ride home one night in November 1974. She stated Rodriguez directed her to a secluded area where he attempted to strangle her and dragged her back into the car after she tried to escape. He then grabbed her by the head, forcing her to perform oral sex on him. He let her go after the attack. He was convicted in Minnesota state court of attempted aggravated rape.

She testified that the effects of the attack have stayed with her for many years. A college freshman in November 1974, she stated that, after the attack, "it just seemed like nothing made any sense anymore." She stopped getting up or going to class and eventually quit school. Living in California several years after the attack, she explained:

> I was having a lot of anxiety, a lot of sleeplessness, almost anxiety attacks about things that would happen, things where if I felt powerless could bring on an anxiety attack. I think that I was pretty distant, detached from people, not willing to make any attachments, pretty fearful, very fearful, maybe some irrational fears of, you know, moving furniture in front of doors if I didn't think the lock was good where I was staying.

She recounted a long history of counseling in rape crisis centers, beginning in Minnesota immediately after the attack and continuing over the years in Arizona, California, and Oregon as she moved around the country.

Rodriguez asserts that the 5438 victim's testimony is insufficient to establish infliction of serious bodily injury because a physician did not diagnose her with Post-

Traumatic Stress Disorder. The parties dispute whether the 5438 victim was ever clinically diagnosed with PTSD.[14]

Rodriguez relies on *United States v. Rivera*, 83 F.3d 542 (1st Cir. 1996), which found a rape victim's testimony did not establish "serious bodily injury" under the federal car-jacking statute, 18 U.S.C. § 2119(2). At the time, the car-jacking statute relied on a definition of "serious bodily injury" found in a criminal statute defining terms related to tampering with consumer products. *See Rivera*, 83 F.3d at 547, *discussing* **18 U.S.C. § 1365(g)(3)**.[15] The statute here, 18 U.S.C. § 3592(c)(4), contains no cross-reference to § 1365(g)(3), and this court declines to interpret the FDPA by relying on a consumer-products standard of serious bodily injury. Moreover, the *Rivera* victim "testified only that she was raped, without any specific description of the assault," whereas here the 5438 and 5447 victims testified at some length about the sexual assaults and resulting psychological effects. *See Rivera*, 83 F.3d at 547.

This court finds instructive *United States v. Kills in Water*, 293 F.3d 432, 435-36 (8th Cir. 2002). Although it construes "serious bodily injury" in the Sentencing Guidelines, and thus is only persuasive here, this court affirmed a serious-bodily-injury sentencing enhancement when, among other impacts, the rape victim experienced "continued psychological problems such as recurring nightmares and attempted suicide, and . . . ongoing need for psychological counseling." *Id.* at 436. *Kills in Water* does not reference a PTSD diagnosis.

---

[14]The *Diagnostic and Statistical Manual of Mental Disorders*, the standard reference work for mental disorders, did not adopt PTSD into its nosology until the third edition of the manual, published in 1980. The 5438 victim could not have received a PTSD diagnosis for at least six years after the attack.

[15]Subsection (g)(3) is now (h)(3). **Product Packaging Protection Act of 2002**, Pub. L. No. 107-307, 116 Stat. 2445, § 1 (2002).

This court concludes that a sexual-assault victim's testimony of psychological injury is sufficient by itself to establish serious bodily injury, even if unaccompanied by a medical diagnosis of PTSD. The 5438 victim's psychological injury is comparable to that of the *Kills in Water* victim. Although the 5438 victim did not attempt suicide, she sought counseling for years after the attack, suffered sleeplessness and extreme anxiety, and exhibited irrational behavior in response to the attack. While a medical diagnosis of PTSD would provide additional collaboration, this court concludes that a rational jury could find serious bodily injury beyond a reasonable doubt based on the 5438 victim's testimony.

### 2. The 5447 victim

The 5447 victim testified that, in 1974, at the end of a date with her boyfriend, she returned alone to her truck. When she opened the vehicle door, Rodriguez was waiting inside. He pressed a knife against her side, commanded her to drive to a remote area, threatened to kill her, and then raped her. Rodriguez was convicted in Minnesota state court for aggravated rape.

At the time of the attack, the 5447 victim was a high school student. She testified that, after the rape, she was depressed, could not sleep, and "missed a lot of days of school." Although she did not receive counseling in 1974 — "nobody really gave me the option" — she later did, in 1987. She testified to an ongoing fear of being alone and suffering from panic attacks, continuing up to the present. Two days before her testimony in this case, she said she had a panic attack at home, went to her room, and "bolted my bedroom door with furniture." She further testified that she had never, at any stretch of her life, been able to put the rape out of her mind.

-49-

As before, Rodriguez challenges the sufficiency of the evidence by arguing that the 5447 victim did not receive a clinical PTSD diagnosis. As noted above, however, a finding of serious bodily injury based on psychological injury does not require a clinical diagnosis of PTSD — particularly when the event occurred six years before such a diagnosis was available, and when the high school-aged rape victim apparently lacked access to counseling. The 5447 victim testified to lifelong impacts, including depression and panic attacks, continuing up to the present day. This court concludes that the testimony was sufficient to establish serious bodily injury.

## C. The 6192 conviction

Rodriguez challenges, on constitutional grounds, the admission of the 6192 conviction to prove serious bodily injury under § 3592(c)(4). This court reviews constitutional challenges de novo. *May*, 535 F.3d at 915.

Rodriguez was convicted in the 6192 case of attempted kidnapping and first degree assault. The facts were:

> Mrs. Whalen [the victim] stood three to four feet from the man. She noticed he was a young Mexican American and looked at his face to determine if he had been one of her students. The man's face was partially lit by a nearby streetlight. They spoke for about one minute when the man grabbed Mrs. Whalen's arm and said, "Get in the car or I'll kill you." Mrs. Whalen struck the man with her mittened hand. She felt a jab in her right side and screamed. She pulled loose from the man and started running home. At that point, Mrs. Whalen turned around to obtain the license number of the car. She failed, but she noticed the car was dark colored.

***Rodriguez v. State***, 345 N.W.2d 781, 784 (Minn. Ct. App. 1984). The victim, a portrait artist by profession, described her attacker to police, assisted with a composite drawing, and selected Rodriguez's photograph as the most likely suspect from a photographic line-up. ***Id.*** Twelve days after the attack, the victim underwent lay hypnosis, and positively identified Rodriguez's photograph as that of the attacker. ***Id.***

After the victim's hypnosis-induced identification, but before Rodriguez's trial, the Minnesota Supreme Court established a new rule for the admission of hypnosis-assisted identifications. ***Id.*** *at 785*, *discussing **State v. Mack***, 292 N.W.2d 764, 772 (Minn. 1980). The state supreme court also "suggested, without adopting, that the police follow certain procedures when conducting hypnosis interviews." ***Id.***, *discussing **Mack***, 292 N.W.2d at 771 n.14. The *Mack* court noted that an affidavit submitted by a hypnosis expert instructs that "[h]ypnosis should be carried out by a psychiatrist or psychologist with special training in its use." ***Mack***, 292 N.W.2d at 771 n.14. A lay hypnotist conducted the 6192 victim's hypnosis, which did not comply with the *Mack* safeguards. ***Rodriguez***, 345 N.W.2d at 784.

At Rodriguez's state court trial, the 6192 victim identified him as the attacker. ***Id.*** No mention was made of the hypnosis. ***Id.*** at 784. Reviewing Rodriguez's conviction, the Court of Appeals of Minnesota held that the victim's testimony complied with the *Mack* admissibility rule, but that police procedures did not follow the suggested safeguards. ***Id.*** at 785-86.

Here, during the eligibility phase, the parties entered into a stipulation about the 6192 conviction, stating: "the victim was confronted by the defendant and directed into his car, [and] an altercation ensued in which the victim was stabbed once in the left elbow and once in the abdominal area on her right side. These injuries required medical attention including stitches to close the wound."

Rodriguez challenges admission of the 6192 conviction in two ways. First, he argues that, due to the lay hypnosis, the 6192 victim's testimony was inadmissible

under current law, and thus the district court should have excluded the conviction as a § 3592(c)(4)-qualifying conviction. Second, he contends that he should have been allowed to introduce evidence showing the 6192 victim did not suffer serious bodily injury.

### 1. Reliability of the 6192 conviction

Identification procedures, if impermissibly suggestive, violate Due Process. ***Foster v. California***, 394 U.S. 440, 442 (1969). This court will assume, without deciding, that a constitutionally invalid state conviction could not be used as a § 3592(c)(4) predicate offense.[16]

The Supreme Court holds that, even when a confrontation procedure is suggestive, a conviction based in part on that witness's testimony is not per se unconstitutional; rather, a reviewing court applies five factors to determine whether the witness's trial testimony was improperly admitted. ***Neil v. Biggers***, 409 U.S. 188, 199-200 (1972). *See **Williams v. Armtrout***, 877 F.2d 1376, 1379-80 (8th Cir. 1989) (applying the five Neil factors, after finding an impermissibly suggestive identification). The *Neil* factors are:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Neil*, 409 U.S. at 199-200 (numbers added).

---

[16]Simultaneous with this case, Rodriguez sought relief from the 6192 conviction in Minnesota state court, alleging ineffective assistance of counsel and improper identification techniques. The Minnesota Court of Appeals affirmed the denial of the petition after the federal jury in this case returned its verdicts. ***Rodriguez v. State***, 2006 WL 2530396 (Minn. Ct. App. Dec. 12, 2006) (unpublished).

In *Neil*, the rape victim-witness spent between 15 and 30 minutes with the attacker, viewing his face under artificial light and moonlight. *Id.* at 194. She provided police with a description of his approximate age, weight, height, and complexion. *Id.* She reviewed 30-40 photographs of suspects, remarked that one suspect had features similar to her attacker, but identified none. *Id.* at 195. Seven months after the attack, police arranged a "show-up" identification session, where the victim identified the habeas petitioner as the attacker. *Id.* At trial, she testified she had "no doubt" about her identification. *Id.* & n.4.

The Supreme Court reversed the lower courts' grant of the habeas petition, despite the impermissible show-up identification session. *Id.* at 200-01. The Court noted that the victim, "a practical nurse by profession," spent nearly half an hour with the attacker. *Id.* Although she identified the attacker seven months after the encounter, she made no intervening identifications, indicating that her "record for reliability was . . . a good one." *Id.* at 201. The Court found "no substantial likelihood of misidentification," and thus no Due Process violation. *Id.*

Here, the victim, a portrait artist, spoke at close range with the attacker for one minute, studying his face to determine if he was a former student. Four days after the attack, she provided police with a detailed physical description, participating in a suspect portrait sketch. Reviewing suspect photographs, she tentatively identified Rodriguez as the attacker, made no other identifications, and then confirmed her identification during the hypnosis session, which occurred twelve days after the attack. Applying the *Neil* factors, this court concludes the 6192 conviction was not based on a constitutionally impermissible identification.

## 2. Presenting evidence of the 6192 victim's injuries

Rodriguez next asserts he should have been permitted to present evidence that the 6192 victim did not suffer serious bodily injury, citing *Sumner v. Shuman*, 483 U.S. 66 (1987). In *Sumner*, the Supreme Court invalidated a Nevada statute requiring a death sentence when a prisoner commits a capital offense while serving a life sentence. *Id.* at 78-79. The Court observed that a death penalty system must permit "the sentencing authority to consider relevant mitigating circumstances pertaining to the offense and a range of factors about the defendant as an individual." *Id.* at 74. Because the Nevada statute automatically imposed death, without any consideration of mitigating factors, it was constitutionally defective. *Id.* at 85.

*Sumner* provides no guidance here. The FDPA does not automatically impose death sentences. The jury in this case had the choice of imposing a life term or death sentence, and Rodriguez presented extensive mitigation evidence.

Rodriguez also relies on a Tenth Circuit decision reversing a death sentence, citing ineffective assistance of counsel, when the defense attorney failed to challenge a prior conviction used as an aggravating factor. *Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001). The Tenth Circuit granted the habeas petition because the defense attorney failed to interview anyone, including the defendant, about mitigation evidence, and presented no such evidence during the penalty phase. *Id.* at 1228-30. In a footnote, the court observed that effective counsel might have uncovered mitigating aspects of a prior crime, including possible self-defense and the influence of alcohol. *Id.* at 1228 n.6.

*Battenfield* is inapplicable here, since Rodriguez's counsel introduced extensive mitigation evidence, submitted 30 mitigating factors, and vigorously disputed the government's aggravating factors. The footnoted comment in *Battenfield* provides no

support for Rodriguez, as the Tenth Circuit was suggesting that defense counsel should have explored whether the facts of the earlier crime could have been viewed sympathetically, not that counsel was deficient for failing to argue that the prior conviction was itself unreliable.

Rodriguez also contends that 18 U.S.C. § 3593(c) allows him to attack the factual predicate of the 6192 offense. That statute provides, in part:

> The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

**18 U.S.C. § 3593(c)**. Section 3593(c) entitles a defendant to receive "fair opportunity" to challenge evidence introduced to prove an aggravating factor. "Fair opportunity" is not unlimited opportunity. Rodriguez stipulated that the 6192 victim suffered two stab wounds requiring medical attention, including stitches to close a wound. This court concludes that a rational jury could find beyond a reasonable doubt a serious bodily injury.

## VII. Penalty-phase jury instructions

Rodriguez challenges three penalty-phase jury-instruction rulings. "The district court has broad discretion in formulating the jury instructions." *United States v. DeMarce*, 564 F.3d 989, 999 (8th Cir. 2009). "Reviewing the instructions as a whole, this court affirms if they fairly and adequately submitted the issues to the jury." *Id.* at 999-1000 (quotations and citations omitted).

A. Mitigating factors instruction

Rodriguez contends the district court's penalty-phase instructions erroneously allowed jurors to disregard mitigating factors found by other jurors. The challenged instruction states:

> Any juror persuaded of the existence of a mitigating factor must consider it in this case. Furthermore, any juror may consider a mitigating factor found by another juror, even if the first juror did not initially find that factor to be mitigating.

Rodriguez asserts this instruction erroneously directs each juror to consider only mitigating factors found by that same juror.

"The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." **18 U.S.C. § 3593(c)**. "A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established." **Id. § 3593(d)**. "[T]he jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence." **Jones v. United States**, 527 U.S. 373, 377 (1999), *citing* **18 U.S.C. § 3593(c), (d)**.

Rodriguez's challenge focuses on the word "initially" in the instruction, which he contends directs jurors to consider only those mitigating factors they personally find, rather than any mitigating factor found by another juror. Even if the word "initially" standing alone were ambiguous, however, Rodriguez's interpretation fails

to account for the preceding clause, which directs that "any juror may consider a mitigating factor found by another juror." Read in its entirety, the instruction accurately states the law. *Cf. Paul*, 217 F.3d at 999 (holding that jury instruction that "each of you must weigh any mitigating factors that you individually find to exist" was ambiguous because it not to explain whether Juror A could consider a mitigating factor found by Juror B, but ambiguity did not establish plain error). The district court did not abuse its discretion by submitting this instruction to the jury.

## B. Death penalty not required

Rodriguez requested penalty-phase jury instructions stating that (1) even if the jury finds aggravating factors outweigh mitigating factors, a death sentence is not required; and (2) a jury is never required to impose a death sentence. The FDPA states, in part:

> [T]he jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death . . . . Based upon this consideration, the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

**18 U.S.C. § 3593(e)**. The defendant "shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified . . . ." *Id.* **§ 3591(a)(2)**. The district court must impose the sentence recommended by the jury in the § 3593(e) process. *Id.* **§ 3594**.

The district court instructed the jury:

> The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone, if you do not find mitigating factors, in order to determine the proper punishment is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater; you should consider the weight and value of each factor.
>
> The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that all aggravating factors proved do not, standing alone, justify imposition of a sentence of death. If one of more of you so find, you must return a sentence of life in prison without the possibility of parole. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death. You are to decide what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.
>
> If you unanimously conclude that the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors that any of you found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factors alone are sufficient to justify a sentence of death, and that therefore death is the appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed on the Special Findings Form. If you determine that death is not justified, you must record your determination that defendant be sentenced to life imprisonment without the possibility of parole.

This court addressed a similar challenge in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002). There, this court rejected the argument that the FDPA mandates a two-step decision-making process — first, whether a sentence of death is justified and second, whether a sentence of death should actually be imposed. *Id.* at 780. Instead, *Allen* interpreted the § 3593(e) penalty deliberation process in light of § 3591(a)(2), which states that the defendant

"*shall* be sentenced to death *if*, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is *justified . . . .*" *Id.*, *quoting* **18 U.S.C. § 3591(a)(2)**. "Mercy is not precluded from entering into the balance of whether the aggravating circumstances outweigh the mitigating circumstances." *Id.* at 781. "The FDPA merely precludes the jury from arbitrarily disregarding its unanimous determination that a sentence of death is justified." *Id.*

Here, the instructions require the jury to review all proposed factors, evaluate their weight and value, and impose a sentence of death if the aggravating factors sufficiently outweigh the mitigating factors. The instructions also explain the converse — that a sentence of life imprisonment without possibility of parole is required if the jury does not unanimously find that aggravating factors sufficiently outweigh the mitigating factors. Rodriguez's proposed instructions would, in substance, graft the second step rejected in *Allen* onto the jury's deliberation process: after determining the balancing process mandates a sentence of death, the jury could, in its discretion, elect not to actually impose death because death is never required. The proposed instructions are inconsistent with the FDPA and *Allen*, and this court finds no abuse of discretion in the district court's ruling.

## C. Residual doubt

Rodriguez argued that no evidence established where and when Sjodin died. If he killed her in the Grand Forks mall parking lot, Rodriguez asserts, he never kidnapped her, but instead transported her corpse across state lines. The guilt phase instructions explained: "The victim is willfully transported in interstate commerce, regardless of whether the victim was alive when transported across a State boundary, if the victim was alive at the moment transportation began." During the penalty phase, the district court rejected a proposed instruction allowing the jury to consider "residual doubt" about whether Sjodin was alive at the moment transportation began.

Rodriguez grounds his challenge on 18 U.S.C. § 3592(a), which permits the jury to consider "any mitigating factor" when weighing a death sentence. "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." **Eddings v. Oklahoma**, 455 U.S. 104, 110 (1982), *quoting* **Lockett v. Ohio**, 438 U.S. 586, 604 (1978) (plurality opinion).

The Supreme Court has declined to require "residual doubt" instructions at sentencing. In *Franklin v. Lynaugh*, Justice White, writing for four Justices, explained:

> Our edict that, in a capital case, "'the sentencer . . . [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense,'" *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982) (quoting *Lockett* [*v. Ohio*]*,* 438 U.S. [586], at 604), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

**Franklin v. Lynaugh**, 487 U.S. 164, 174 (1988) (plurality opinion) (citations omitted).

Justice O'Connor's concurring opinion in *Franklin*, joined by Justice Blackmun, also doubts the constitutional basis of a "residual doubt" instruction.

> Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or

the circumstances of the particular offense, that may call for a penalty less than death. "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." Petitioner's "residual doubt" claim is that the States must permit capital sentencing bodies to demand proof of guilt to "an absolute certainty" before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.* at 188 (O'Connor, J., concurring) (citations omitted).

*Franklin* addressed the constitutional claim in favor of a "residual doubt" instruction, rather than an argument based on § 3592(a). The Justices' reasons for declining to recognize a constitutional rule apply with equal force the FDPA. Residual doubt is not a mitigating circumstance of the defendant or of the offense. Rather, residual doubt, if it exists, highlights the difficulty of ever proving anything with complete certainty. Section 3592(a) does not require a district court to grant such an instruction at sentencing, and the district court here did not abuse its discretion by rejecting Rodriguez's request.

## VIII. Constitutional challenges to the death penalty

Rodriguez raises several constitutional challenges to the federal death penalty. This court reviews de novo constitutional challenges. *May*, 535 F.3d at 915.

Rodriguez argues that the death penalty, as applied in federal cases, is unconstitutional because the government seeks death in a higher percentage of cases involving white victims than minority victims. *See* **18 U.S.C. § 3593(a)** (authorizing the government to seek capital punishment when "the attorney for the government

-61-

believes that the circumstances of the offense are such that a sentence of death is justified . . . .").[17]

The Supreme Court's opinion in *McCleskey v. Kemp*, 481 U.S. 279 (1987), controls Rodriguez's challenge to the nationwide administration of the death penalty. There, the Court stated "to prevail under the Equal Protection Clause, [a defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* at 292.

To prevail on a selective prosecution claim, Rodriguez must show (1) he was singled out for prosecution while others similarly situated were not prosecuted for similar conduct, and (2) the decision to prosecute him was based on an impermissible motive such as race, religion, or an attempt by the defendant to secure other constitutional rights. *United States v. Huber*, 404 F.3d 1047, 1054 (8th Cir. 2005) (quotations and citation omitted). Rodriguez cites comments, by several venirepersons who did not serve on the jury, indicating a distrust of Hispanics. Venirepersons motivated by racial animus may not serve on a jury. *Aldridge v. United States*, 283 U.S. 308, 314 (1931). Here, the venirepersons who made the objectionable comments did not serve, and their comments do not show that the government had a race-based motive for seeking the death penalty. This claim fails.

Rodriguez also asserts that the Federal Death Penalty Act is unconstitutional. The government charged aggravating factors in the indictment, to be found by the

---

[17]A U.S. Attorney may not seek the death penalty without approval from the Attorney General. **United States Attorneys' Manual § 9-10.040**. Rodriguez cites data from the Federal Death Penalty Resource Counsel Project showing that, between 2001 and 2007, the Attorney General authorized death penalty prosecutions in a higher percentage of cases involving white female victims than cases with white male victims or nonwhite victims. *See* **Declaration of Kevin McNally regarding the Gender and Race of Victims in Federal Capital Prosecutions since 2000 (2007)**.

jury, complying with *Ring v. Arizona*, 536 U.S. 584, 609 (2002). Since the FDPA does not specifically provide that aggravating factors can be charged in an indictment, Rodriguez maintains the FDPA is unconstitutional under *Ring*. This argument is foreclosed by precedent. **United States v. Purkey**, 428 F.3d 738, 748 (8th Cir. 2005).

Finally, Rodriguez argues the indictment was constitutionally defective because it failed to include the non-statutory aggravating factor submitted to the jury. This court rejected a similar claim in *Purkey*, concluding that because non-statutory aggravating factors do not increase the maximum eligible penalty, they need not be included in the indictment returned. "Non-statutory aggravating factors do not increase the maximum punishment to which a defendant is subject." *Id.* at 749. "They are neither sufficient nor necessary under the FDPA for a sentence of death." *Id.*

Rodriguez distinguishes *Purkey*, a Fifth Amendment challenge, by basing his argument on *United States v. Blakely*, 542 U.S. 296 (2004), which holds that the Sixth Amendment prohibits a judge from finding facts that raise the maximum penalty beyond that authorized by the jury's verdict. *Id.* at 301. "[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-04.

*Blakely* is consistent with *Purkey*'s conclusion that non-statutory aggravating factors need not be in the indictment. In an FDPA case, once the jury finds a statutory aggravating factor, it can impose death without any additional findings. Although non-statutory aggravating factors may alter the calculus of death penalty deliberations, they do not raise the maximum authorized penalty, and therefore do not violate the Sixth Amendment, as interpreted by *Blakely*.

IX.


The judgment of the district court is affirmed.


MELLOY, Circuit Judge, concurring in part and dissenting in part.


I concur in all of the majority's thorough opinion except Section V, ante at 29–41. I would hold that several errors in the government's penalty-phase closing arguments resulted in cumulative prejudice requiring a new penalty-phase trial.


I.


In reaching this conclusion, I do not take lightly the jury's finding of several serious aggravating factors, the extreme violence of the crimes against Dru Sjodin, or the overwhelming evidence of the defendant's guilt. However, we must ensure that jurors have been allowed to serve their proper role with full consideration of all relevant factors and full opportunity to exercise the discretion vested solely in their hands. When assessing prejudice in this context we must keep in mind the unique nature of the discretion vested in the capital sentencing jury and the importance of this discretion in the weighing function the jury performs. See Zant v. Stephens, 462 U.S. 862, 874–79 (1983).


The majority finds at least two penalty-phase errors but holds them, individually and cumulatively, to have been non-prejudicial. These errors include: the government's mischaracterization of the law in its statement to the jury that the death penalty was required to punish the defendant for the murder because a life sentence punished only the kidnapping, ante at 32–33, and the government's improper

denigration of the defense as trying "to sell" something to the jury, ante at 36–37. I agree with the majority to the extent it found error as to these two issues.

I would hold these errors to be more serious than does the majority. In addition, I would hold that the government improperly appealed to passion and emotion through its "Golden Rule" argument in which it inappropriately claimed to speak for the victim and asked the jurors to put themselves in the place of the victim. Further, I would hold that the government improperly argued that mitigating factors were irrelevant in the absence of a nexus between the factors and either the seriousness of the offense or the defendant's ability to form the necessary *mens rea*. Finally, I would hold that the curative actions were insufficient to correct these errors such that the cumulative effect of these errors resulted in prejudice to the defendant.

## II. Mischaracterization of the Law

Regarding the government's mischaracterization of the law, I find the error more substantial than does the majority. The government argued to the jury that a death sentence was necessary to provide additional punishment beyond the penalty that would have resulted from a kidnapping alone. Initially, the government argued that the defendant "could" receive a life sentence for the kidnapping alone, ante at 32. After the district court sustained an objection to the statement cited by the majority, the government immediately continued in its improper line of argument, stating:

> Prison is what Alfonso Rodriguez knows. Prison is what he's asking for, but death row is what he has earned, and a sentence of death is what this defendant's intentional aggravated crimes call for under the law of the United States. *A prison sentence punishes the kidnapping alone.*

-65-

(Emphasis added). The defense again objected, and the court again sustained the objection. In addition, in rebuttal, the government revisited this improper line of argument, stating:

> Let the defendant know that these heinous, cruel, depraved torturous factors in this intentional murder will not be treated as a freebie for which there is no extra punishment on top of what he would have gotten, as [defense counsel] said at the end of the first phase of this trial. Tell Alfonso Rodriguez that no matter what he thought as Dru Sjodin desperately needed mercy, no matter what he thought, Dru Sjodin was not a freebie.

Taken in context with the other statements, I am left with the firm impression that the government misinformed the jury regarding the unavailability of a term of years for a non-fatal kidnapping offense, necessarily bolstering the impression that the death penalty was the only available means to impose a punishment for the murder. In fact, kidnapping alone could have resulted in "imprisonment for any term of years or for life." 18 U.S.C. § 1201(a). Punishment for a kidnapping resulting in the death of any person is "death or life imprisonment." Id. The defendant's murder of Sjodin, then, eliminated the possibility of a term of years and placed defendant in jeopardy for the death penalty. As such, it was a mischaracterization of the law to tell the jury that the death penalty was necessary to punish the defendant for the murder as contrasted with a non-fatal kidnapping.

Although I find it unnecessary to address the prejudice flowing from this single error, I note that the government returned repeatedly to a theme of duty throughout closing, telling the jury, effectively, that they would not be carrying out their duty if they failed to return a death penalty. See Caldwell v. Mississippi, 472 U.S. 320, 341 (1985) (holding that it is improper to lead the jury to believe that they lack discretion and to minimize the jury's sense of responsibility for imposing the death sentence); see also Weaver v. Bowersox, 438 F.3d 832, 840 (8th Cir. 2006) ("Describing jurors

as soldiers with a duty eviscerates the concept of discretion afforded to a jury as required by the Eighth Amendment."). In addition, the government referred repeatedly to claims that "the law" or "the law of the United States" required the jury to impose the death penalty. Coupled with such statements, a mischaracterization of the death penalty as the only potential way to distinguish between punishment for the kidnapping offense alone and punishment for the murder held great potential to mislead the jury.

## III. Denigration of the Defense

Regarding the denigration of the defense, I would not apply mere plain error review to assess the propriety of the latter of the government's statements. In closing arguments, the defense made at least twelve objections to statements by the government. The court clearly sustained eight of those objections, expressly overruled two of the objections, and made general statements of instruction to the jurors as to the remaining objections. Even as to the latter of these rulings, the court appeared to acknowledge the impropriety in the government's statements, saying, "The intent factors have in fact been found, I suggest you move on" and instructing the jury to disregard statements inconsistent with the instructions and to apply the law as provided by the court.[18] In addition, statements from the government at sidebar suggested that the court had admonished the attorneys prior to closing arguments, telling them to keep objections to a minimum. The government's closing argument

_____

[18]Twelve objections was the total number of objections, not merely objections directed at denigrating statements. Also, at least one of these overruled objections arguably should have been sustained. The government stated, "The issue of punishment for the defendant is not an issue of how it affects his family, not under the law." Along with the other nexus-requirement arguments that the government asserted, as discussed below, I would interpret this statement to be a claim by the government that jurors were not to consider impact on the defendant's family members as a mitigating factor.

and rebuttal filled only about fifty-three pages, include several lengthy on-record sidebar discussions. In this context, I would hold that the defense more than adequately preserved its objections to the government's statements as related to each issue raised herein, even if the defense failed to object as to every individual statement that it referenced in the motion for a new trial.

As quoted above, the government described the defense as trying to "sell" something to the jury. The government also referred to the "nature of the case in mitigation" as being "put it up, hope it sticks," and referred specifically to an expert's opinion as "utter nonsense in a court of law." Finally, the government disparaged defense counsel's integrity with reference to a particular argument, stating, "Why mention it then? Just another cloud to blast up into the air hoping that no one is going to notice." As in United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005), I would hold these statements to be improper because they "encourage the jury to focus on the conduct and role" of the defense team rather than the evidence, and because the inflammatory nature of the statements was designed to anger the jury through general denigration of the defense. Id. Such tactics improperly inject emotion into the deliberation process rather than aid the jury in its assessment of evidence. Further, reference generally to the "nature of the case in mitigation" suggests broader knowledge, experience and expertise by the government in such matters. Such an argument phrased in general term risks pulling the jury outside the facts of the case. It "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18–19 (1985).

Again, I find it unnecessary to assess prejudice related to this error in isolation. Rather, I would view the impact of these improper statements in light of the several errors addressed herein.

## IV. Golden Rule

Regarding the government's claim to speak for the victim, I find more than an improper argument unsupported by evidence, ante at 38–40. I agree with the majority that "it is improper to ask jurors to put themselves in the place of the victim." Roberts v. Delo, 205 F.3d 349, 351 (8th Cir. 2000). I also agree with the majority's statement that "a prosecutor's brief claim to 'speak for' a victim is improper if, in the context of surrounding statements, the comment appeals excessively to jurors' emotions." Ante at 39. I depart with the majority, however, as to its view of the surrounding statements and the context as a whole in this case. The government's surrounding statements directly solicited emotional response and appealed to jurors' fears and prejudices. The context as a whole included all of the errors discussed herein, several designed to elicit emotional rather than deliberative consideration, and others to obfuscate the relevance and value of mitigating factors. I again find it unnecessary to assess this error in isolation; rather, I would take a broader view of the relevant context in assessing the extent to which such a statement appeals to jurors' emotions, and I have difficulty discounting the impact of the government's statements.

## V. Nexus Requirement

Finally, and perhaps most importantly, I would hold that the government improperly argued that there needed to be a nexus between mitigation evidence and the offense and that the instructions were insufficient to cure this error. This error resulted in a reasonable probability that one or more "jurors believed themselves precluded from considering relevant mitigating evidence." United States v. Paul, 217 F.3d 989, 1000 (8th Cir. 2000). Viewed cumulatively with the other errors, I would find prejudice sufficient to require the granting of the motion for a new penalty-phase trial.

Supreme Court precedent is clear: there is no nexus requirement between mitigating factors and the severity of the crime or the future dangerousness of the defendant, and it is reversible error to preclude the jury from considering a mitigating factor. See Abdul-Kabir v. Quarterman, 550 U.S. 233, 246 (2007) ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."). That having been said, it is permissible for a prosecutor to argue to a jury that, in the jury's weighing of factors, the jury may accord any given factor "little or no weight." See United States v. Johnson, 495 F.3d 951, 978 (8th Cir. 2007) ("[A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight."); Paul, 217 F.3d at 1000 ("There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence.").

Here, the government did more than merely tell the jury that it could elect to give mitigating factors little or no weight. The government, over strenuous objections from defense counsel and through a contentious instruction-selection process, obtained permission to argue the concept of mitigating factors as involving three distinct questions: (1) has the defendant proven the factor; (2) does the factor, in fact, mitigate in the present case, i.e., is it relevant in this case; and (3) what weight should the jurors give the factor. This framework, in the abstract, is unobjectionable, and the district court properly determined prior to the selection phase that the government could argue to the jury that any given factor was not relevant "in this case."

The error arises because, against the backdrop of this framework, the government did not merely tell the jury that it could find factors not relevant or accord them little or no weight. Rather, the government gave the jury its own definition of relevancy in terms of a nexus between the factor and the severity of the offense or the

-70-

defendant's ability to formulate the necessary *mens rea*. In addition, the government went even further, obfuscating the court's instructions by telling the jurors expressly that the court was not going to define relevancy. Simply put, it would have been permissible for the government to inform jurors that they need not find factors relevant, but the government in this case incorrectly defined relevancy for the jury and mischaracterized the instructions as failing to define relevancy.

To properly analyze arguments regarding the introduction of a nexus requirement, it is necessary to discuss the government's statements, as set out in detail below. It is also necessary to consider the court's response to objections concerning those statements, the relevant jury instructions, and the resultant effect that the instructions, the government's statements, and the court's curative actions, together, would have had on the jurors' understanding of how they were to assess mitigating evidence.

The government stated in its selection-phase opening statement that "the issue of punishment for the defendant is not an issue of how it affects his family, not under the law." The defendant objected, but the court overruled the objection, calling the statement argument and telling the jury that he had instructed them as to what mitigating factors are alleged and directing the jury to take counsel's argument "in light of the instructions." A defendant's possible value to other human beings and the impact of the defendant's execution on the defendant's family members are without question valid mitigating factors. The jury should have been so instructed in light of the government's improper statement. Smith v. Texas, 543 U.S. 37, 45 (2004) (vacating a death sentence where a jury was not permitted to fully consider mitigation evidence and stating, "Because petitioner's proffered evidence was relevant, the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence.").

-71-

Later the government stated that the defendant had

> the burden of proof . . . the burden of relevance when it comes to these proposed mitigators . . . .  Also, the information has to be shown that the information mitigates in this case.  Whether proven or not, *does it mitigate, tend to lessen the severity in this case*?  A Defense proposal for mitigation or mitigation that you find is *only qualified to go on the decision scale if you answer yes for both of those mitigation  questions*, and then there's a third issue, what weight do you want to give it?  If either of those first two is not proven, either factually or that it mitigates, then you don't have to give further consideration to that proposed factor.

(Emphasis added).  The government continued in its argument, the defendant objected, and the court correctly sustained the objection.  As discussed below, I believe more corrective action was required because I find it impossible to interpret this statement as anything but a nexus requirement as prohibited by <u>Abdul-Kabir</u>, 550 U.S. at 246.

> Soon thereafter, the following exchange took place in front of the jury:

> Government:  With regard to the test for what is and is not a mitigating factor, it is on this second determination, the matter of does it mitigate in this case, that the defendant's mitigating factors fail most obviously right down the line.  The decision on what is mitigation in this case is up to you, ladies and gentlemen.  *And while the court will not tell you how to determine what is or is not mitigating in this case*, the United States further submits that this can and should be one of your tests for what is mitigating.  *Does the factor explain what the defendant did to Dru Sjodin or reduce the defendant's responsibility*?

> Defense Counsel:  Your Honor, I'm going to object.  First part of that is incorrect.

> Court:  Once again, I will remind the jury that I have instructed you on the law that applies to this case.  If there is any statement made by any

-72-

party that is inconsistent with the statements that I have given, you should disregard them and apply the law as I have given it to you.

(Emphasis added).

This exchange prompted a lengthy sidebar discussion during which defense counsel stated, "The court has to do more, frankly, than just saying, frankly, you've heard what I said. That isn't correct, and that objection should have been sustained. I'm sorry. You can't argue things that are not the law." At the end of the lengthy sidebar discussion, the court ultimately sustained the objection, albeit outside of the presence of the jury. Again, it was correct to sustain the objection, but in this instance, the jury did not hear that the court sustained the objection. And again, I believe more curative action was needed.[19]

---

[19]During the sidebar, the court provided a clear articulation of the error in the government's argument and made a statement that, if made to the jury, would have gone a long way towards mitigating the impact of the government's error. Outside the presence of the jury the court stated:

As I read what was actually said, it does appear to me that the government has indicated that the appropriate test ought to be whether or not something explains or in some manner or fashion—I can't remember the exact word—the crime. *It strikes me one of the problems is not all mitigating factors actually go—the mitigation may not lie in explaining the crime itself. I mean, some mitigation goes to explain the nature of the defendant's character.* And if you look at what the statute provides for is that if they were to take this to some sort of a legal test and apply it to every one of the mitigators, it wouldn't be appropriate. All right? And I think that's clear. Now I've told the jury what I believe they ought to do. I think you should leave this argument. I believe that as it lays in that it's right on the edge and their are problems with [it].

(Emphasis added).

-73-

Later, notwithstanding the court's comments during the sidebar, the government again argued that the jury had to find a nexus requirement, urging the jury not to find factors mitigating if they did not bear upon the offense. In reference to a series of factors that the defendant had alleged as mitigating factors, the government stated:

> Perhaps these factors would mitigate the defendant getting into a fistfight with one of the people who wronged him long ago, but what could it have to do with a 22-year-old girl the defendant spotted in a mall, lusted after, kidnapped, assaulted and raped, and finally killed on November 22nd, 2003?

Finally, extending the theme that mitigating factors had to have some nexus to the crime, the defendant's *mens rea* for the crime, or his ability to control his criminal urges, the prosecutor stated:

> If you decide that some of the proposed factors are proven factually, *they do not mitigate we argue to you in this case because they do not influence the defendant's ability to choose*, and therefore, choose differently. You get to choose if they mitigate.

(Emphasis added).

Regarding objections and curative actions, the defendant did not object after every one of the government's statements quoted above. The defendant did, however, object to the government's pursuit of this argument prior to the sentencing phase, after several government statements, and during the lengthy sidebar. In the context of the closing argument in this case, then, I would hold that the defendant more than adequately preserved and articulated his objection to the government's attempt to impose a nexus requirement. As such, I consider it appropriate to consider all of the statements quoted above in assessing prejudice.

As noted, the district court's repeated curative action following the defendant's objections was an oral admonition telling the jury to disregard any statements contrary to the jury instructions. I view the instructions, while correct statements of law, as not sufficient to negate the government's articulation of a nexus requirement. The final instruction regarding the weighing of mitigating and aggravating factors required the jury to make findings as to whether mitigating factors had been proven and weigh any such mitigating factors to make a determination as to "whether or not the circumstances in this case justify a sentence of death." See Sentence Selection Phase Final Instruction No. 4. This final instruction expressly referenced a preliminary instruction that provided, "A mitigating factor is any aspect of a defendant's character or background, any circumstance of the offense in question, or any other relevant fact or circumstances that might indicate that the defendant should receive a sentence of life imprisonment, without the possibility of parole instead of a death sentence." See Sentence Selection Phase Preliminary Instruction No. 2.[20] In the absence of prosecutorial misstatements, then, the instructions properly provided a broad definition for mitigating factor.

The instructions, while sufficient in the abstract, were not sufficiently clear to aid the jury in properly rejecting a nexus requirement. The standard set forth by the Supreme Court requires relief if there is a reasonable likelihood that the jury believed it could not consider a mitigator. See Buchanan v. Angelone, 522 U.S. 269, 276 (1998) ("Our consistent concern has been that restrictions on the jury's sentencing

---

[20]I suggest a better instruction would inform the jury expressly that no nexus is required, *i.e.*, that aspects of the defendant's character or background or any other relevant fact or circumstance need not be related in any manner to the crime. That having been said, this preliminary instruction, again, is consistent with the model instruction on this point and does not contain language affirmatively suggesting the presence of a nexus requirement. See Eighth Circuit Model Death Penalty Instruction No. 12.09. And the question before the court is not the sufficiency of the instruction in the articulation of the law, but the sufficiency of the instruction, standing alone, to serve as the sole curative statement against the government's repeated misstatements of the law.

determination not preclude the jury from being able to give effect to mitigating evidence. . . . [T]he standard for determining whether jury instructions satisfy these principles [is] whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (internal citation omitted)). I find in the present case more than "a reasonable likelihood" that the government's statements effectively eliminated from the jury's consideration those mitigators that did not satisfy an improper-nexus requirement as to the severity of the offense or the defendant's ability to form the necessary *mens rea*. In effect, the government set up an artificial barrier limiting what the jury could consider to be relevant mitigation evidence, and at no time was the jury told that the government's statements were incorrect statements of law.

## VI. Cumulative Prejudice

Unlike a habeas case or other collateral attack where a defendant must use ineffective-assistance claims as gateway arguments to get claims before the federal court, this is a direct appeal. As such, we may consider the cumulative impact of the government's statements, and there is no requirement that we consider each error or government misstatement separately when assessing impact on the jury. Compare Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006) ("We repeatedly have recognized a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." (internal quotation omitted)) with Holmes, 413 F.3d at 774–75 (8th Cir. 2004) (remanding for a new trial based on cumulative error).

Here the nexus-requirement error, and to an extent the mischaracterization of the possible penalty for a non-fatal kidnapping, are qualitatively different than the Golden Rule and denigration errors. The former two may prejudice the defendant through obfuscation of the legal standards whereas the latter may prejudice the defendant by inflaming the jury. Still, I believe cumulative effect is apparent. As

-76-

already noted, relief is warranted if there is a reasonable probability that one or more jurors believed themselves "precluded from considering relevant mitigating evidence." Paul, 217 F.3d at 1000. The nexus-requirement error, standing alone, provides the defendant with a strong argument for relief in this case. To reject the defendant's claims of prejudice as to this issue, it would be necessary to presume the application of a level of skill and analysis not typically demanded of jurors and not appropriate in the context a capital trial. When viewed in light of the inflammatory statements designed to steer the jurors away from reasoned deliberation and towards emotional reaction, and when viewed against the claims of duty and the statement that a life sentence would punish only the kidnapping and make the murder "a freebie," I view the proper rejection of a nexus requirement to be a difficult, confusing, and likely unattainable task for jurors untrained in legal analysis. As such, I am firmly convinced of the reasonable probability that one or more jurors failed to appreciate the full spectrum of available mitigating factors and the full spectrum of discretion that they were entitled to exercise.

I would vacate the death sentence and remand for further proceedings.

_____